**OLENDER v. UNITED STATES.**
No. 13658.

United States Court of Appeals
Ninth Circuit.
Feb. 15, 1954.

Leo R. Friedman, San Francisco, Cal., for appellant.

H. Brian Holland, Asst. Atty. Gen., S. Walter Shine, Sp. Asst. to Atty. Gen., Ellis N. Slack, Chief, Appellate section, Department of Justice, David L. Luce, Joseph M. Howard, Sp. Assts. to Atty. Gen., Lloyd H. Burke, U. S. Atty., Robert J. Drewes, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before STEPHENS, HEALY and BONE, Circuit Judges.

BONE, Circuit Judge.

Appellant stands convicted on all counts of a four-count indictment charging him with wilfully attempting to defeat and evade federal income taxes by filing false and fraudulent income tax returns on behalf of himself and his wife for the taxable years 1945 and

1946 in violation of 26 U.S.C.A. § 145 (b). Appellant was sentenced to three years' imprisonment and a fine of $10,000 on each of the counts 1, 2 and 3, the sentences to run concurrently, and to pay an additional fine of $10,000 on count 4.

During the taxable years involved appellant was the sole owner and operator of the "Army and Navy Store" in Oakland, California, which sold service men's uniforms and other merchandise at retail. Appellant employed a part-time bookkeeper but supervised the maintenance of the books himself. The books were admittedly incomplete, and the government therefore relied upon the familiar net worth-expenditures method to prove that appellant and his wife received taxable income in 1945 and 1946 which they failed to report. This method of proof requires the government to show the net worth of the taxpayer as of the beginning and the end of the taxable year and the non-deductible expenditures made by him that year. If the increase in his net worth plus his non-deductible expenditures exceed his reported income for the year, and such excess is not attributable to gifts, devises, loans or other non-taxable receipts, then the conclusion may be drawn that the taxpayer realized income which he failed to report. McFee v. United States, 9 Cir., 206 F.2d 872; Papadakis v. United States, 9 Cir., 208 F.2d 945.

Appellant presents 11 specifications of error. In the first five specifications he challenges the sufficiency of the evidence on all counts. Specifications 6 through 10 deal with questions as to the admissibility of certain government evidence, and in specification 11 appellant attacks an instruction given the jury by the trial court.

## The Evidence

The government claims to have established, under the net worth-expenditures theory, that appellant and his wife realized taxable income which they failed to report in the amounts shown in the following table (the figures including the income of both appellant and his wife, who reported their income on a community property basis):

| Year | Net Income | Reported | Unreported |
|------|-----------|----------|-----------|
| 1945 | $88,052.77 | $41,067.61 | $46,985.16 |
| 1946 | $48,856.23 | $23,514.62 | $25,341.61 |

The defense attempted to show that the net worth of appellant and his wife as of December 31, 1944 was higher than that stated by the government in its computation of unreported income, that the increase in their net worth for the two years was less, and that a part of this increase did not represent taxable income. The defense evidence, if believed, established that appellant and his wife received only a negligible amount of unreported income in 1945 and that they over-reported their income for 1946.

Most of the facts on which the government based its calculations were stipulated. The more than 1400 pages of record and the stacks of exhibits deal with about eight issues of fact, of which only three, the parties agree, were of critical importance. The three critical issues were these: (1) Did appellant have $50,000 or $72,000 in his safe deposit box on December 31, 1944 (the starting date for determining the income of appellant and his wife for the years 1945 and 1946 under the net worth-expenditures theory)? (2) Did appellant's Army and Navy Store have on hand $20,550 in sailor suits from the Goodman Sales Agency on December 31, 1944, as appellant claimed? (3) Were certain government bonds in the amount of $20,000, purchased in 1945, the property of appellant's mother and acquired with her funds, as appellant contended?

We have carefully studied the record. It would serve no good purpose to discuss the evidence in detail. On two minor issues defects in the government's case were established. On the second of the three major issues stated above, involving the so-called "Goodman

Transaction," the theory of the defense was corroborated in part, but only in part, by Lewis Leavy, a government witness. On the third of the critical issues, relating to the $20,000 in government bonds, Charles Ringo, appellant's accountant and a government witness, testified that in May of 1948 he saw the $20,000 in bonds in appellant's safe deposit box and that they were earmarked as belonging to appellant's mother. This was after the investigation of appellant's tax matters had been commenced, however, and it was conceded that appellant reported the interest on the bonds as income of himself and his wife in 1947.

There is substantial evidence in the record to sustain the conclusion that appellant and his wife realized very sizable amounts of income in 1945 and 1946 which they failed to report. With the exceptions noted above, the defense had to rely almost wholly upon the uncorroborated testimony of appellant to refute the government's case. Bearing in mind that the credibility of the witnesses was a question for the jury, that the evidence must be viewed in the light most favorable to the government, and that it was not necessary for the government to prove with mathematical certainty any precise amount of unreported income, we think the evidence was sufficient to sustain the verdict on all counts, even if we disregard that evidence which, as will be pointed out shortly, was erroneously admitted in evidence. Papadakis v. United States, supra; McFee v. United States, supra; Gendelman v. United States, 9 Cir., 191 F.2d 993; Rollinger v. United States, 8 Cir., 208 F. 2d 109.

## Admissibility of Evidence

*Government Exhibit 55.* Appellant testified that in 1945 his mother-in-law, Mrs. Laura J. Foote, made a gift to him of $2500. His sister-in-law, Ella Widrin, testified that on Mrs. Foote's death in 1945 she gave $575 which she had been holding for Mrs. Foote to appellant to use for Mrs. Foote's funeral expenses or as appellant saw fit. If believed, this evidence established that the government overstated the taxable income of appellant and his wife for the year 1945 by the amount of the money appellant received from Mrs. Foote and Ella Widrin.

In rebuttal the government called as a witness Donald A. Jensen, Director of the Fresno County Department of Public Welfare. Jensen identified a group of papers as the file of Laura J. Foote from the official files of the Fresno County Public Welfare Department. This file related to old age security benefits paid to Mrs. Foote in the years 1939–1942. The file contained the following documents:

(1) Four forms filled out and signed by Mrs. Foote during the period 1940–1942. Two of these forms were affidavits. Summarizing the contents of the four documents, they contained, inter alia, statements by Mrs. Foote that no change had occurred in her property holdings after 1939, at which time she had, according to another form in the file, only $152.09 in personal property; that she had no personal property in excess of $500; that she had no real property; and that by June 17, 1942 she had disposed of her $150 worth of personal property.

(2) Six reports of investigators for the Welfare Department containing, inter alia, the same information as that appearing in the forms filled out by Mrs. Foote summarized above.

(3) An affidavit by Betty Olender, appellant's wife, as a "responsible relative" of Mrs. Foote, stating that she (Betty Olender) and her husband did not own their own home; that she (Mrs. Olender) had no cash on hand, no bank deposits, no postal savings, no funds in a safe deposit box, and no negotiable securities; that her personal property consisted of a $100 automobile; and that the earnings of her spouse (appellant) were "$150." This affidavit was dated May 23, 1939.

(4) Five reports from banks, four stating that Mrs. Foote had no deposits

and one stating that she had a joint deposit with Mrs. Betty Olender of $152.-09.

The government offered this file, first, to show that Mrs. Foote had no money to give appellant in 1945 and, second, to impeach, by means of Betty Olender's affidavit, appellant's testimony that his father had made gifts of $5000 a year to appellant and his wife jointly in the years 1930 to 1940.

In the court below the defense objected to the admission of the entire (Ex. 55) file in evidence on the ground that it was irrelevant and hearsay. The first of these grounds has been abandoned. On this appeal the hearsay objection is reasserted and two additional contentions are made. First, appellant argues that the file should have been excluded because it is made confidential by a statute of the State of California. Deering's California Codes, Welfare and Institutions, § 118. Appellant did not invoke this statute in the court below. By failing to do so he waived any objection based upon the confidentiality of the file and cannot now raise the question on appeal.

Appellant next contends that the affidavit of Mrs. Olender (in government Ex. 55) should have been excluded under the rule that a wife cannot testify against her husband. It is generally held that this rule extends to extrajudicial statements of a wife, such as the affidavit of Mrs. Olender in the instant case, as well as to the testimony of the wife in Court. 8 Wigmore on Evidence, §§ 2232, 2233 (3rd Ed.). Appellant contends that the objection should be noticed by us even though not made in the trial court, since the rule disqualifies the wife from testifying against her husband, and there can be no waiver of an absolute disqualification or disability.

Appellant is mistaken. The rule, now almost extinct, that a husband or wife is disqualified as a witness applied only in cases where a husband or wife sought to testify *in behalf of* his or her spouse. See Cohen v. United States, 9 Cir., 214 F. 23, 29; 2 Wigmore on Evidence, §§ 601, 602 (3rd Ed.). That rule was abolished in the federal courts in 1933 by the case of Funk v. United States, 290 U.S. 371, 54 S.Ct. 212, 78 L.Ed. 369. What remains is the rule that a husband or wife cannot be compelled to testify *against* his or her spouse and cannot be permitted to do so unless the other spouse consents. 8 Wigmore on Evidence, § 2241 (3rd Ed.). This rule is one of privilege, and the privilege may be waived. Cohen v. United States, supra, 214 F. at page 29; United States v. Levy, 3 Cir., 153 F.2d 995; United States v. Mitchell, 2 Cir., 137 F.2d 1006, 1007–1008; 8 Wigmore on Evidence, § 2242 (3rd Ed.). The privilege was waived in the instant case by the failure of either appellant or his wife to invoke it in the trial court. Cohen v. United States, supra; United States v. Levy, supra; 8 Wigmore on Evidence, § 2242 (3rd Ed.).

There remains the interesting question whether the file (Ex. 55) should have been excluded as hearsay. The file was introduced and received in evidence under the official documents exception to the hearsay rule. This exception to the hearsay rule was recognized at common law. See Hedrick v. Hughes, 15 Wall. 123, 82 U.S. 123, 21 L.Ed. 52; Village of Evanston v. Gunn, 99 U.S. 660, 25 L.Ed. 306; Vanadium Corp. of America v. Fidelity & Deposit Co. of Maryland, 2 Cir., 159 F.2d 105, 109; 5 Wigmore on Evidence § 1638 (3rd Ed.). For official documents of the United States Government the exception is now provided for in 28 U.S.C.A. § 1733, which is made applicable to criminal cases by Rule 27, Fed.Rules Crim.Proc., 18 U.S.C.A. As has been pointed out, however, this statute deals primarily with the method of proof of official documents and is of no aid in determining what *kinds* of official documents are admissible. Vanadium Corp. of America v. Fidelity & Deposit Co. of Maryland, supra, 159 F.2d at page 109; United States v. Grayson, 2 Cir., 166 F.2d

863, 869. Such questions must be worked out in accordance with the principles of the common law "as they may be interpreted by the courts of the United States in the light of reason and experience." Rule 26, Fed.Rules Crim. Proc., 18 U.S.C.A. For purposes of applying the rule no difference has been recognized between documents of federal, state and county governments. See Hedrick v. Hughes, supra; Sandy White v. United States, 164 U.S. 100, 17 S.Ct. 38, 41 L.Ed. 365; E. K. Hardison Seed Co. v. Jones, 6 Cir., 149 F.2d 252; Franklin v. Skelly Oil Co., 10 Cir., 141 F.2d 568, 153 A.L.R. 156; Gilbert v. Gulf Oil Corp., 4 Cir., 175 F.2d 705; Rollins v. Board of Commissioners, 8 Cir., 90 F. 575.

██ Generally stated, the rule is that all documents prepared by public officials pursuant to a duty imposed by law or required by the nature of their offices are admissible as proof of the facts stated therein. See Greenbaum v. United States, 9 Cir., 80 F.2d 113, 126. The reason of the rule is that it would be burdensome and inconvenient to call public officials to appear in the myriad cases in which their testimony might be required in a court of law, and that records and reports prepared by such officials in the course of their duties are generally trustworthy. Wong Wing Foo v. McGrath, 9 Cir., 196 F.2d 120; 5 Wigmore on Evidence, §§ 1631, 1632 (3rd Ed.).

Since the official documents are a substitute for the personal appearance of the official in court, it is generally held that such documents, to be admissible, must concern matters to which the official could testify if he were called to the witness stand. Vanadium Corp. of America v. Fidelity & Deposit Co. of Maryland, supra, 159 F.2d at page 109; 5 Wigmore on Evidence, § 1635 (3rd Ed.). Thus, this circuit and most of the other circuits which have passed on the question have held that the facts stated in the document must have been within the personal knowledge and observation of the recording official or his subordinates, and that reports based upon general investigations and upon information gleaned second hand from random sources must be excluded. Greenbaum v. United States, 9 Cir., supra, 80 F.2d at page 126; Vanadium Corp. of America v. Fidelity & Deposit Co. of Maryland, 2 Cir., supra; United States v. Grayson, 2 Cir., supra; Gilbert v. Gulf Oil Corp., 4 Cir., 175 F.2d 705; Long v. United States, 4 Cir., 59 F.2d 602; Gilmore v. United States, 5 Cir., 93 F.2d 774; Connecticut Mutual Life Ins. Co. v. Lanahan, 6 Cir., 112 F.2d 375; Third Nat. Bank & Trust Co. v. United States, 6 Cir., 53 F.2d 599; cf. Franklin v. Skelly Oil Co., 10 Cir., 141 F.2d 568, 153 A.L.R. 156; United States v. International Harvester Co., 274 U.S. 693, 703, 47 S.Ct. 748, 71 L.Ed. 1302; see also 5 Wigmore on Evidence, § 1635 (3rd Ed.).[1]

The documents in Government Exhibit 55 may be divided into two groups. The first group consists of the documents prepared by persons and firms outside the public agency concerned—the statements and affidavits of Mrs. Foote, Mrs. Olender and the five banks. The second group consists of the records and reports prepared by investi-

---

[1] Apparently to the contrary are Hunter v. Derby Foods, 2 Cir., 110 F.2d 970, 133 A.L.R. 255; E. K. Hardison Seed Co. v. Jones, 6 Cir., 149 F.2d 252; Moran v. Pittsburgh-Des Moines Steel Co., 3 Cir., 183 F.2d 467; see also American Law Institute Model Code of Evidence, Rules 515, 516. We notice that the Hunter case, supra, is seemingly inconsistent with the later Vanadium Corporation and Grayson cases, cited in the text of our opinion, which were also decided by the Second Circuit. And the E. K. Hardison case, supra, is seemingly inconsistent with the earlier Connecticut Mutual case, cited in the text of our opinion, also from the Sixth Circuit. The opinion in the E. K. Hardison case would indicate that the documents there involved were in fact prepared by officials having first hand knowledge of the facts stated therein, and it may thus be harmonized with the Connecticut Mutual case.

gators and officials of the Fresno County Public Welfare Department.

■ The documents in the first group were clearly outside the official documents rule. They were not prepared by public officials pursuant to the duties of their offices. They were simply statements of private individuals and firms to the Welfare Department in aid of an investigation of Mrs. Foote's financial needs. We were confronted with a similar problem in the recent case of Wong Wing Foo v. McGrath, supra. In that case the government sought to introduce sworn testimony given by a witness before a Board of Special Inquiry of the Immigration Department on the ground that the transcript of the proceeding was a part of the "official records" of a government agency. After a discussion of the policy of the official documents rule, we held that the recorded testimony did not come within it, since it was not a statement by a public official pursuant to the duties of his office. That case is controlling here. Since the recorded testimony of an individual before a quasi-judicial tribunal is not admissible, then *a fortiori* the assorted forms, reports and affidavits of private individuals and firms here in issue, given in the course of an informal administrative inquiry into a person's finances, are not.

■ The second group of documents in the file—those prepared by investigators and officials of the Welfare Department—were indeed "official" and prepared pursuant to duty imposed by law. See Deering's California Codes, Welfare and Institutions, § 2180 et seq. But these documents did not concern matters within the personal knowledge and observation of the recording officials or their subordinates. They were based upon the forms and affidavits of firms and individuals outside the Welfare Department which we above held were inadmissible. Thus the records and reports prepared by the officials of the Welfare Department also fall outside the official documents exception to the hearsay rule. The instant case demonstrates the rea-

son for limiting the exception to official records based upon the personal knowledge of the recording official or his subordinates. For if the statements of the private firms and individuals to the Welfare Department are themselves inadmissible, it would be most anomalous to hold that the investigators' repetitions of those statements may be admitted. Multiple hearsay can hardly have a higher standing than single hearsay.

The issues to which Government Exhibit 55 related were not of vital importance in the case. The amount of the funds allegedly received from Mrs. Foote was small compared with the total unreported income which the government evidence tended to prove. And appellant's testimony that he and his wife received large gifts from his father in the years 1930–1940 seems to be irrelevant, for the defense and the government seem to have been agreed as to the net worth of appellant and his wife as of the end of the year 1941. How appellant and his wife accumulated their assets prior to that time was immaterial. But the file was of considerable significance on the question of the credibility of appellant. If the jury took this impressive array of official-looking documents at face value, then they must have believed that appellant was a liar. Again and again the prosecutor referred to this file in attacking the credibility of appellant in his closing argument to the jury.

*Testimony of Whiteside.* Appellant testified that he received six gifts of money from his mother, Mrs. Mollie Olender, during his lifetime, including a gift of $3000 in 1945. He testified that his mother had withdrawn money from her accounts in one of two named banks or, possibly, from some other source to make these gifts, and he specified the dates of the gifts.

On rebuttal the government called as a witness R. L. McNab, "pro-assistant cashier" of the Bank of America in Fresno, one of the two banks named by appellant in which his mother had deposits. From the records of this bank

McNab testified that there were withdrawals from the account of appellant's mother on five of the six dates on which, according to appellant's testimony, he received gifts from his mother. The amounts of the withdrawals were the same as the amounts of the gifts which appellant testified he received. McNab traced each withdrawal to a redeposit of the withdrawn amount into another account of appellant's mother, or into the account of appellant's sister in the same bank. The government also called Melbourne C. Whiteside, an Internal Revenue Agent who testified that he checked the accounts into which the money withdrawn by appellant's mother had been redeposited; that there were minor withdrawls and one withdrawal of $1000 from one of these accounts prior to the end of the year 1946, and that there were no other withdrawals from these accounts prior to that time. This evidence tended to refute appellant's testimony that he received the six gifts of money from his mother on the dates he specified. Following the testimony of Whiteside, summarized above, the prosecutor examined Whiteside as follows:

"Q. * * * will you state whether you did anything else except checking the bank records? A. Yes, we did.

"Q. Will you state whether or not you discussed with anyone this matter? A. Yes.

"Q. With whom did you discuss this matter? A. With Mrs. Mollie Olender.

"Q. And about what month was that discussion held? A. We talked to her on two occasions, on November 17 and November 18, 1948.

"Q. Now, Mr. Whiteside, as a result of your checking the bank records in Fresno here in evidence and as a result of your discussions with Mrs. Mollie Olender, I will ask you whether or not, for the purposes of your report, you made a determination as to whether the six

items represent gifts which were made by Milton Olender—strike that—which were made by Mrs. Mollie Olender to her son Milton?

"Mr. Hagerty [Defense Counsel]: Well, if your Honor please, again we will enter an objection. The question is both leading and suggestive. It also is again calling for the conclusion and opinion of the witness, and partially based on hearsay.

"The Court: Overruled.

"A. Yes, we made a determination on that.

"Q. What was that determination?

"Mr. Hagerty: We enter the same objection, your Honor.

"The Court: Overruled.

"A. Our determination was that the gifts were not in fact made."

The defense objection should have been sustained. Whiteside's answer was a conclusion based in part, and in principal part, upon out-of-court conversations with appellant's mother. It was an indirect but very effective means of getting the effect of the extra-judicial statements of appellant's mother before the jury. The error was probably not of great consequence, for the government, by use of the bank records, had already done a pretty good job of discrediting appellant's testimony as to the gifts received from his mother. A little room for doubt was left, however, for appellant had testified that the gifts to him may have come from some source other than his mother's bank accounts. By getting in Whiteside's "opinion" based upon conversations with appellant's mother, the government sought, and very likely succeeded, in removing this doubt.

*Government Exhibit 45.* As indicated above, one of the three critical issues of fact in the case was whether appellant had $50,000 in cash in his safe deposit box as of December 31, 1944, as the government contended, or $72,000, as appellant claimed. To support its

view on this question the government relied solely upon two purported "work papers" of appellant's accountant, Charles Ringo, who had been engaged by appellant early in 1948 to prepare a net worth statement for him. The first of these papers was Government Exhibit 26. According to Ringo, this paper was prepared by him on the basis of estimates furnished by appellant of the items comprising the net worth of appellant and his wife as of the ends of certain years. The paper contained an express notation that there was $50,000 in appellant's safe deposit box as of December 31, 1944. Ringo testified, however, that the paper was by no means the result of a final and complete study of appellant's finances.

It was agreed between the parties that appellant had $75,000 in cash in his safe deposit box as of December 31, 1941, that there was more than $70,000 in the box in May of 1944, and that the cash in the box was exhausted, or nearly so, by the end of the year 1946. To buttress its claim that there was only $50,000 in the box at the end of the year 1944 the government introduced in evidence Government Exhibit 45, another purported "work paper" of Ringo. Entries under "Item 19" of this paper indicated the amounts and dates of withdrawals from appellant's safe deposit box in the years 1943–1946. Considered along with the agreed facts as to the cash in the box as of the end of the year 1941, May of 1944, and the end of the year 1946, Item 19 of this exhibit tended to show that there must have been $50,000 in the box at the end of the year 1944. To meet this evidence the defense introduced in evidence what amounted to an accountant's summary or schedule of deposits and withdrawals from the deposit box in the years 1944–1946, based largely upon appellant's testimony. If believed, this exhibit established that there must have been about $72,000 in the box at the end of the year 1944.

As the above discussion indicates, Government Exhibit 45 was of some importance in the case. This exhibit was received in evidence under the following circumstances. When Whiteside, the Internal Revenue Agent, was being cross-examined by the defense during the government's case in chief, he testified that in determining appellant's cash on hand as of December 31, 1944, he had had recourse to work papers of Ringo containing answers of appellant in his own handwriting to questions propounded by Ringo; that these papers showed how the cash in appellant's safe deposit box had been disposed of and stated that there was $50,000 in the box at the end of the year 1944. Whiteside testified that he got this information through Ringo, and not from appellant himself.

On redirect examination of Whiteside the government offered Exhibit 45 in evidence as the work paper to which Whiteside had referred. It was offered for the limited purpose of showing the critical "Item 19" which appeared therein. Whiteside identified Exhibit 45 as a photostatic copy of one of the work papers of Ringo which Ringo had loaned him and which he had returned. The defense objected to admission of the document on the ground that the document had not been properly identified. Government counsel then asserted that the testimony of Ringo, an earlier government witness, had established that Ringo had asked appellant a number of questions to which appellant had given answers, that Whiteside's testimony had identified Exhibit 45 as containing such questions and answers, and that Ringo's testimony had established that the document was in appellant's own handwriting. The defense again objected that the document had never been properly identified. The court, apparently on the understanding that the paper was in appellant's handwriting, received it in evidence, limited for evidentiary purposes to Item 19 thereof.

Ringo had never identified any document as being in appellant's handwriting, nor had he referred to any specific document, except Government Exhibit

26, as containing information furnished him by appellant. Moreover, when appellant was on the stand later in the trial, he testified that, although he believed Exhibit 45 was one of the lists of questions submitted to him by Ringo, the handwriting was not his except for some irrelevant notations in the left-hand margin, and that the figures appearing in the critical Item 19 had no meaning to him.

Still later, during the government's case in rebuttal, Whiteside corroborated appellant's testimony that the pertinent portions of Exhibit 45 were not in appellant's handwriting, when he testified that both Exhibits 26 and 45 were "work papers wherein *Mr. Ringo* has written in his own hand certain leggends." An inexpert examination by us of Exhibits 26 and 45 would indicate that, as Whiteside testified, both are in the same handwriting, and it is undisputed that Exhibit 26 was in the handwriting of Ringo.

Finally, the defense also offered, and the court received, Exhibit 45 in evidence for the limited purpose of showing "Item 20" appearing therein, which related to an entirely different issue. This offer came after Seth Root, another Internal Revenue Agent, had testified that he (Root) had furnished Ringo the information shown in Item 20 on the basis of certain data obtained by the Internal Revenue Agents in the course of their investigation. Root testified that Item 20 was in Ringo's handwriting. The purpose of the defense in offering this item of Exhibit 45 in evidence was apparently to show that the government had knowledge of the facts stated therein.

From the confusing pattern outlined above the following may be fairly said: (1) No one ever testified that the pertinent portions of Exhibit 45 were in appellant's handwriting; the testimony of appellant, Whiteside and Root were to the contrary; (2) Ringo never identified the document or referred to it in any manner; (3) Whiteside testified that Ringo told him that Exhibit 45 was a work paper of Ringo based upon information given him by appellant; (4) appellant testified that the document appeared to be one of the lists of questions submitted to him by Ringo, but the entries in the critical Item 19 had no meaning to him; (5) some of the information in Exhibit 45 was furnished by Root, an Internal Revenue Agent.

We think the defense objection to Exhibit 45 should have been sustained. Whiteside's testimony as to the nature of the document was pure hearsay, based solely upon extra-judicial statements to him by Ringo. It was never identified or referred to by Ringo, although Ringo had been on the stand as a government witness. Assuming that appellant's testimony sufficiently identified the document as one of Ringo's work papers, still there was no competent evidence as to the source of the information appearing in Item 19 of the document. For all that appears, the information in the exhibit might all have been given Ringo by Internal Revenue Agents. We think Exhibit 45 should have been excluded because of a failure to properly identify it.

*The Ringo Testimony.* Charles R. Ringo was engaged by appellant early in the year 1948 to prepare a net worth statement for appellant after the investigation by the Internal Revenue Bureau of appellant's tax matters had been commenced and Bureau Agents had requested such a statement. Ringo also prepared appellant's tax returns for the years 1947 and 1948. Ringo was both a certified public accountant and an attorney qualified to practice law in the State of California.

The government called Ringo as a witness. The defense objected to Ringo's testimony concerning communications made to him by appellant on the basis of the attorney-client privilege. The trial court overruled the objection and ruled that Ringo could testify as to "accounting matters." Appellant attacks this ruling on the ground that it is impossible to segregate the functions

of an attorney-accountant, engaged to perform a single integrated task, into "accounting matters" and "legal matters." We do not pass upon this argument, for the trial court later explained the basis of his ruling as follows: " * * * in the instant case there is no evidence at all that the gentleman, Mr. Ringo, at any time functioned as a lawyer, or in fact the defendant employed him as a lawyer. He was employed as an accountant solely and simply." The trial court referred in this connection to a previous decision in which he had stated the rule as follows: "If * * * a lawyer undertakes to translate his activities into those of an accountant * * * it would seem elementary that the transactions in question would not be clothed with a privilege." United States v. Chin Lim Mow, D.C.N.D.Cal., 12 F.R.D. 433, 434.

■ We think the ruling of the trial court was correct. The attorney-client privilege is limited to communications made in the course of seeking *legal advice* from a professional legal adviser *in his capacity as such.* 8 Wigmore on Evidence, § 2294. Thus, communications to an attorney in the course of seeking business rather than legal advice are not privileged, United States v. Vehicular Parking, D.C.D.Del., 52 F. Supp. 751; nor are communications to an attorney who acts simply as a scrivener of deeds, or who simply deposits money in a bank for his client. Pollock v. United States, 5 Cir., 202 F.2d 281. Coming a bit closer to the instant case, the privilege has been held inapplicable to communications to one who was both an attorney and accountant where made solely to enable the practitioner to audit the client's books, In re Fisher, D.C.S. D.N.Y., 51 F.2d 424; or to simply prepare a federal income tax return. Clayton v. Canida, Tex.Civ.App., 223 S.W. 2d 264; see also United States v. Chin Lim Mow, supra.

■ In light of these authorities, we think the communications sought to be excluded in the instant case were outside the scope of the privilege. So far as the record shows, the only purpose for which Ringo was hired was the preparation of appellant's net worth statement and his tax returns. All of his activities appear to have been incidental to those tasks. It is significant that appellant, on the advice of a friend, went to an *accounting firm* to secure the services of Ringo, who was a member of the firm, and that the moment a question arose as to whether certain information should or should not go into the net worth statement appellant and Ringo went to Monroe Friedman, *appellant's attorney,* to seek legal advice on the matter. When asked why he wanted a lawyer to prepare the net worth statement, appellant testified that there were many items which concerned his mother, who was old and in bad health, and that he did not want those items disclosed. But this, if believed, establishes only that appellant desired an accountant he could trust. It did not make the transaction one in which appellant sought legal advice from a lawyer *in his capacity as such,* as the rule requires. In sum, the record does not support the conclusion that Ringo was hired as an attorney but indicates instead that he was engaged simply as an accountant to prepare a financial statement and income tax returns, and to do nothing more.

At the outset of Ringo's testimony and after he had stated that appellant told him that he wanted an attorney who was an accountant to prepare his net worth statement, counsel for the defense, on voir dire, asked Ringo this question: "And at this time the relationship of attorney and client was set up?" The government objected on the ground that the question called for the opinion and conclusion of Ringo, and the court sustained the objection. Appellant contends that this was error. We think not. Had Ringo answered "yes" to the question it would have meant little, for the answer would merely have been Ringo's legal conclusion on a question which had ultimately to be decided by the court on the basis of all the per-

tinent facts. The court might properly have taken the opinion of Ringo on this question but we do not think it was obliged to do so.

### The Court's Instructions

■ Appellant contends that the court below erred in giving the following instruction to the jury:

"You are further instructed that when in the trial on charges of income tax evasion discrepancies between the defendant's return and his actual income are indicated by the government's proof, the failure of the defendant to offer explanation in any form may be considered by you in arriving at your verdict."

The government points to appellate court opinions using language similar to that appearing in the challenged instruction. Bell v. United States, 4 Cir., 185 F.2d 302, 309, certiorari denied 340 U.S. 930, 71 S.Ct. 492, 95 L.Ed. 671; Jelaza v. United States, 4 Cir., 179 F.2d 202; Stinnett v. United States, 4 Cir., 173 F.2d 129. In the cited cases the language was used (by way of argument) in discussing the sufficiency of the evidence to support the verdict, and for that purpose it may have been appropriate. However, we think it was an improper instruction to give to the jury.

■ The net worth-expenditures theory of proof was explained to the jury in other instructions. The court also thoroughly instructed that the burden was upon the government to prove the crime charged beyond a reasonable doubt. These instructions properly presented the issues to the jury. The challenged instruction was unnecessary and very possibly misleading. By the instruction the court told the jury that if discrepancies between actual and reported income were "indicated" by the government's proof, it could consider the defendant's failure to explain such discrepancies in arriving at its verdict. But to properly reach a verdict of guilty the jury had to infer from the proof "indicating" discrepancies that appellant did *in fact* realize income which he failed to report and, further, that appellant thereby wilfully attempted to evade taxes. The vice of the instruction in issue is that it tended to divert attention from the question whether the government evidence established these facts beyond a reasonable doubt, to the presence or absence or nature of the defendant's "explanation." On the basis of this instruction the jury might have discounted great weaknesses in the government's case because of the silence of the defense. While the words of the instruction did not in terms shift the burden of proof to the defendant, they might well have had that effect in the minds of the jurors. In these net worth-expenditures cases, based as they are upon an elaborate scheme of circumstantial evidence, it is particularly important to keep the jury's attention riveted upon the ultimate question whether the government has sustained its burden of proving the crime charged beyond a reasonable doubt. See Demetree v. United States, 5 Cir., 207 F.2d 892; Lurding v. United States, 6 Cir., 179 F.2d 419, 422.

The challenged instruction is in some ways similar to that given in Bihn v. United States, 328 U.S. 633, 637, 66 S. Ct. 1172, 90 L.Ed. 1485. That case involved a prosecution for conspiracy to steal ration coupons. The defense was that persons other than the defendant could have stolen the coupons. The trial judge instructed fully that the burden was upon the government to prove the crime charged, beyond a reasonable doubt, but he also instructed: "Who would have a motive to steal them? Did she [the defendant] take these stamps? You have a right to consider that. * * Did she steal them? Who did if she didn't? You are to decide that." The Supreme Court held that the giving of the instruction was reversible error, saying " * * * to put the matter another way, the instruction may be read as telling the jurors that if petitioner by her testimony had not convinced them that someone else had stolen the ration coupons, she must have done so."

328 U.S. at page 637, 66 S.Ct. at page 1174.

Similarly, the instruction here in question might be read as telling the jurors that, if appellant had not come forward with convincing explanations of discrepancies "indicated" by the government's proof, then they might from that circumstance find him guilty. The challenged instruction, considered as a part of the lower court's charge as a whole, would not, in itself, be sufficiently prejudicial to require a reversal, but it must be considered along with the other errors committed at the trial.

### Were the Errors Prejudicial?

■ The final question is whether the errors committed in the course of the lengthy trial below can be said to be "harmless" under Rule 52(a), Fed. Rules of Crim.Proc., or whether they are such as to require reversal. The case of Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557, teaches that "it is not the appellate court's function to determine guilt or innocence. * * * Nor is it to speculate upon probable reconviction and decide according to how the speculation comes out. * * * It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. * * * If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. * * * But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." 328 U.S. at pages 763–765, 66 S.Ct. at page 1247.

Applying these principles here, we think the errors committed require a reversal. This was by no means an open and shut case for the government. The critical issues of fact were close and hotly contested. On the cold record there is little to choose between the government and defense versions of the facts on these issues. Inconsistencies and occasional confusion developed on both sides of the controversy as details of complex financial transactions of appellant multiplied. The jury was left with the difficult decision of which version of the facts to accept. And since the defense case rested primarily upon the testimony of appellant, it was his credibility which was principally at issue. The trial judge correctly remarked in colloquy with counsel that "the beginning and the ending of the case is the credibility of the defendant." The prosecutor told the jury the same thing in effect in his closing argument, and devoted most of his efforts to convincing the jury that appellant was unworthy of belief.

It is impossible to estimate the damage done appellant's credibility in the eyes of the jury by the admission of Government Exhibit 55—the old age security file of Mrs. Foote. There was other evidence of inconsistent statements on the part of appellant. Some of these were such as might be expected from an honest witness attempting to reconstruct complex financial transactions which occurred many years prior to trial. In one or two instances apparent self-contradictions by appellant were of a more significant character, but none were more glaring than those established by Government Exhibit 55, if the documents in that exhibit were believed. Exhibit 45, which was erroneously admitted, was of considerable importance

on a critical issue in the case. These errors and the other instance of evidence erroneously admitted, considered along with the possibly misleading instruction to the jury, might have been enough to tip the scales against appellant in a case as close as this.

The judgment is reversed. The cause is remanded with directions to grant a new trial.