**Beatrice RAUCH, a Widow, Appellant,**

v.

**UNDERWRITERS AT LLOYD'S OF LONDON, Appellee.**

No. 18269.

United States Court of Appeals
Ninth Circuit.

July 8, 1963.

Rehearing Denied Aug. 13, 1963.

Richter, Rodgers, Wimberley & Ericson and Walter R. Rodgers, III, Spokane, Wash., for appellant.

Paine, Lowe, Coffin, Herman & O'Kelly, Horton Herman and Eldon H. Reiley, Spokane, Wash., for appellee.

Before HAMLIN and DUNIWAY, Circuit Judges, and BOWEN, District Judge.

BOWEN, District Judge.

In this diversity case, appellant appeals from the Trial Court's refusing to direct a jury verdict in her favor, directing a jury verdict for appellee and dismissing this action brought in the Trial Court by appellant, plaintiff below, to recover the $50,000.00 maximum on an insurance policy issued by appellee, defendant below, insuring appellant's deceased husband Wayne Rauch against accidental death, and naming appellant as beneficiary. At all material times, appellant was and is a citizen of Idaho, appellee was and is an alien, being a citizen or subject of the United Kingdom, a foreign state, and the matter in controversy exceeds the sum of $10,000.00, exclusive of interest and costs. The Trial Court under 28 U.S.C.A. §§ 1332 and 1391 had, and this Court under id. § 1291 has, jurisdiction.

Involved here are the August 24, 1958 crashing of a land-based private airplane into Fish Lake, Idaho during take-off from an airstrip adjacent to the lake, and the related deaths of appellant's husband, the plane's owner-pilot Wayne Rauch, and his passenger Dale Brunton, following their fishing trip to the lake on that day. No relief is here sought respecting Dale Brunton.

At the time of the accident and of decedent Rauch's death, the policy was in full force and effect, provided insurance against said decedent's death from accidental drowning, and all policy conditions required of the insured and of the beneficiary were timely performed, but the policy contained an aviation exclusion clause stating that

"* * * This certificate does not cover death * * *
"(e) * * * while the Assured is operating * * * or serving as a member of a crew of an aircraft."

The case was tried before the Court with a jury. At the close of plaintiff's case in chief, defendant moved for a directed verdict but the Court reserved ruling, and defendant then proceeded with its case in chief. At the close of all the evidence, each side moved for a directed verdict in its favor and defendant additionally moved for dismissal. The Court orally granted defendant's motions and denied plaintiff's motion. The Court later entered in written form findings of fact, conclusions of law, and an order denying plaintiff's motion for directed verdict in her favor, directing a verdict in defendant's favor and dismissing plaintiff's action with prejudice upon the merits.

Appealing from that court action, plaintiff as appellant now assigns as error her contentions that the Trial Court erred:

1. In refusing to grant plaintiff's motion for directed verdict in her favor.

2. In granting defendant's motion for directed verdict in its favor.

3. In granting defendant's motion for dismissal with prejudice.

4. In making Findings of Fact numbered X, XI, XIV, XVI, XXII, XXIV and XXVI.

5. In making Conclusions of Law numbered III, IV, V, VI, VII, VIII and IX.

6. In rejecting plaintiff's Exhibit 2, a certified copy of the coroner's certificate of decedent Rauch's death.

The main question to be decided here is whether the decedent Rauch died "* * * while operating * * * or serving as a member of a crew of an aircraft". Largely dependent upon that question's answer are the answers to the other questions, except the one as to the Trial Court's rejecting plaintiff's offer of her Exhibit 2, the coroner's death certificate containing a statement that drowning caused decedent Rauch's death which was information obtained by the certifying coroner from another coroner.

Fish Lake is located at elevation 5,800 feet in a primitive mountainous area of Idaho about 100 air miles north of Lewiston, with the emergency airstrip here involved located on land adjacent to the westerly shore of the lake. The Trial Court found the lake's length to be about 3,400 feet with its axis approximately in line with that of the airstrip, the length of which was said by one witness to be about 2,937 feet. The lake serves as an obstruction-free continuation of the airstrip's landing and take-off area.

The accident occurred about 5 o'clock in the afternoon of a clear summer day when the temperature was about 76°. Visibility and ceiling were clear. Ordinarily that time of day with that temperature was not chosen by pilots for take-off from that airstrip because down drafts are usually then present over the lake. Under those conditions, pilots usually wait until after the adjacent airstrip is in shadow before taking off, because, as the Trial Court found, density of air decreases with increase of altitude and temperature, and as air density decreases the runway length and speed needed for take-off increase, and the lift ability of the airplane decreases.

In this case, the plane heavily loaded with the weight of its fuel, a deflated rubber raft, the fishing equipment and the 440-pound total weight of the two men, took off normally from the airstrip, flying easterly out over the lake, but after going some distance and gaining altitude, the plane settled over the lake and its wheels touched the lake surface. Then it rose again, continued flying at about 60 to 90 m. p. h. over the lake and finally, at a point about three-fourths the distance down the lake from its westerly shore, suddenly descended into the lake, striking its surface in a three-point attitude, then sinking in a very rapid manner nose downward and coming to rest with its nose on the bottom of the lake and with a part of the tail assembly extending upward about 2½ feet above the lake surface. A witness on shore within sight of the plane when it was ditched said "I saw it rise slightly and hit the

528

water and spray fly, a considerable flash. I was amazed at the rapidity with which it sunk. It went down nose first". He had an unobstructed view, and kept it "in very close vision", but did not nor did any other witness after the crash on the day it occurred see any survivors, nor did any witness then hear any shouts or anything of that kind, although sound carried well over the lake.

The above quoted witness in order to get nearer the sunken plane ran along a rough forest trail around the intervening lake shore to a point on the lake bank near the plane, arriving there about 15 minutes after the crash. Thence he swam out about 150 to 250 feet to the sunken plane, tied a fastening line from shore to plane and dived into the water around it searching for survivors, but then found none. He and other witnesses found the plane nose downward and touching the muddy bottom, and that the plane would support them as they rested on it, and one of them stood on the trailing edge of the left wing 3 or 4 feet from the fuselage with his face above the water.

The plane and surrounding water were examined for several days by skin divers beginning the next day after the sinking. The Trial Court in harmony with the divers' testimony found in substance as follows: A portion of the plane's windshield was broken out and a brace on the pilot's side inside the windshield was slightly bent. The door on the pilot's side was open and partially torn from its hinges. The seat belts were unfastened and in their normal unfastened position on the seats. The right door on the passenger's side was found closed but was normally functional from the outside. No damage was found to the steering wheel or to the instrument panel. Some of the plane's exterior portions were damaged. The right wing struts (fastenings between wing and fuselage) were bent and the fuselage was wrinkled near the wing roots. The plane's engine was undamaged except by water, and it with the plane was later salvaged. By the Trial Court the throttle was found closed and the flaps in a down position.

The lake where the plane sank was about 14 to 18 feet deep. The lake water around the plane was cold. Near the sunken plane there was a slight spring-fed underwater current. There was a heavy low growth of vegetation in the lake extending upward from the bottom 1 to 5 feet. Divers found no path or indication of a struggle in that marine growth. Underwater visibility was 3 to 5 feet, and a cloudy condition prevalent in the water was aggravated when that vegetation was disturbed.

On August 25, 1958, with a grappling hook passenger Brunton's submerged body was found about 15 to 20 feet from the plane's left wing tip in a crouched position with one leg outside a trouser leg and one shoe off, but without visible signs of bodily injury except from the grappling hook. His missing shoe was also found about 20 feet from the left wing tip. On August 27th, the third day after the accident, during grappling operations, decedent Rauch's body surfaced about 5 or 6 feet from the plane. The cause of his death was not medically determined. There was a small bruise in the middle of his forehead. It is admitted by both sides that decedent Rauch died in the lake water.

In the pre-trial order it is admitted by the parties that at the time of the accident Mr. Rauch was the plane's pilot holding a private pilot's license. He could not swim and was afraid of the water.

About 30 days after the accident, the plane was recovered from the lake, when further examination disclosed much the same damage to the plane as had been previously found by the skin divers.

The Trial Court found that there is no evidence of any cause of decedent Rauch's death independent of and not resulting from the settling of the plane in the lake, and that after the plane sank, decedent Rauch never reached a position of safety or of potential safety. Also it was concluded by the Court that decedent Rauch

died while operating, and while serving as a member of a crew of, an airplane; that the facts are not in dispute and that the words and language of the aviation exclusion clause are not ambiguous.

The Trial Court further ruled that, assuming Mr. Rauch surfaced after the plane was in the water and died from drowning because of his inability to reach shore by swimming, nevertheless as a matter of law his death was within the aviation exclusion clause of the policy, and that plaintiff-appellant has shown no right to relief upon the facts and the law.

Upon the conclusion of all the evidence, and after stating the substance of it, the Trial Court stated that the evidence was undisputed and not in conflict, and ruled that

" * * * There was no direct testimony that they (decedents Rauch and Brunton who were aboard the plane) were seen outside of the plane (near the time the plane crashed) but there was a possibility that they might have been and, so, taking that most favorably for the plaintiff you have a situation where they could have surfaced after the plane was in the water and drowned because of their inability to reach shore by swimming.

"Now, the plaintiff seeks to have the Court take the position and instruct the jury that since there is no direct evidence that these parties died in the plane while the plane was in flight or because of an abrupt stop of the plane, that the particular clause (the aviation exclusion clause) in the policy which I will presently read did not apply." (The Court then read the exclusion clause as above set out.)

"Plaintiff seeks to have me make the interpretation that he (decedent Rauch) ceased to be a member of the crew or ceased to operate the airplane immediately that it struck the water and ceased to fly; that he thereby became a non-operator or non-pilot of the plane, *and that his subsequent death and drowning was the primary cause of death and, therefore, that she can recover and the exclusion provisions do not bar the recovery.*" (Parentheses and emphasis added.)

The Trial Court then reviewed certain cases including McDaniel v. Standard Accident Ins. Co., 7 Cir., 221 F.2d 171; Eschweiler v. General Accident Fire & Life Assur. Corp., 7 Cir., 241 F.2d 101; Willingham v. Life & Casualty Ins. Co. of Tennessee, 5 Cir., 216 F.2d 226, and Neel v. Mutual Life Ins. Co. of New York, 2 Cir., 131 F.2d 159 (all of which four cases involved clauses barring or limiting recovery for death *resulting* from aeronautic activity), and further stated:

"And in this particular case I find that the words in the policy are not ambiguous. The facts in the case are not in dispute, and taking * * * the evidence most favorable to the plaintiff which would be that this man came down in a land-based plane in the lake, and that he got out of the plane and that he drowned thereafter before he reached shore as a result of the plane having fallen into the lake. I hold that the predominant cause was the one that was excluded from the policy, the predominant cause was the plane going down in the lake while he was the pilot, and that he died as a result of the predominant cause, to-wit, the incident of the plane in the lake. That the fact that he drowned later after he got out of the plane is not something that I would be able to submit to the jury. * * *"

No Washington Court decision on the application of an aviation exclusion clause to facts like those here has been called to our attention and our search discloses none, but the very similar case of Wendorff v. Missouri State Life Ins. Co., 318 Mo. 363, 1 S.W.2d 99, 57 A.L.R. 615, decided by the Missouri Supreme Court, gives unusually strong support to the

Trial Court's decision here. There the decedent passenger was insured against accidental death, but the policy contained an exclusion clause barring recovery for "injuries fatal or nonfatal * * * sustained by the insured * * * *while* in or on any * * * mechanical device for aerial navigation * * *." (Emphasis added.) The insured was drowned at sea about 8½ miles from Bimini in the Bahama Islands after he went or was thrown overboard from a seaplane on which he was a passenger after its landing and capsizing in the water following engine trouble in flight from Miami, Florida to Bimini. A few minutes later the insured's lifeless body was seen floating in the water close by. At the trial after proving the foregoing facts, the appellant administrator of the estate of the beneficiary, who also died in the same casualty, contended that the case should have been submitted to the jury but was not. Instead the Trial Court held as a matter of law that the exclusion clause barred recovery and peremptorily instructed for the defendant insurer. Upon appeal, appellant contended that such

"* * * clause has no application because: (1) The provision refers only to injuries sustained while actually flying in the air; * * * (3) the insured was not injured either while in the machine or in falling therefrom, but lost his life by drowning."

That Missouri Court held that

"As the facts are undisputed, the case turns on the construction to be given the policy. We are of the opinion that the casualty came within the stipulated exception, and that the conclusion of the trial court was right * * *.

* * * * * *

"[1, 2] * * * When the proof is documentary, or the defendant relies on the plaintiff's own evidential showing (or evidence which the plaintiff admits to be true), and the reasonable inferences therefrom all point one way, there is no issue of fact to be submitted to the jury. (Citing.)

"[3] That was the situation in the instant case. The only questions to be determined were and are whether, under the admitted facts—from appellant's standpoint—the seaplane was a flying machine within the meaning of the policy provision, and, if so, whether the insured, in falling from the floating craft and drowning, lost his life in the manner contemplated by the clause. These were both questions of law arising on a construction of the policy, and were to be determined by the court, not by the jury. (Citing.)

"[4, 5] In the construction of the policy, the rules to be followed are well settled. The policy is a contract. Plain and unambiguous language must be given its plain meaning. The contract should be construed as a whole; but, in so far as open to different constructions, that most favorable to the insured must be adopted. (Citing.) However, as said in 14 R.C.L. § 103, p. 931, the rule 'does not authorize a perversion of language, or the exercise of inventive powers for the purpose of creating an ambiguity where none exists. * * *' "

And upon those facts that Court ruled

"Furthermore, the clause by its plain terms does not except alone injuries suffered while navigating the air. It specifies injuries sustained while *in or on any vehicle or mechanical device for* aerial navigation, or *in falling therefrom or therewith,* or while *operating or handling* any such vehicle. Unless we do violence to the unequivocal language used, we must hold, as we do, that it covers activities on the ground, or water, as well as in the air when connected with the use of the machine in aeronautics. In taking off for a flight, a seaplane must attain a certain speed on the water, and to slow down and stop it must light on the water.

These are indispensable parts of the movement. In Pittman v. Lamar Life Ins. Co. (C.C.A.) 5 Cir., 17 F. (2d) 370, the insured, following an air trip, descended from his airplane, and walked around the front thereof toward his automobile. He was struck by the airplane propeller, and killed. It was held he was engaged in 'aeronautic activity.' The Court said:

" 'The aeronautic activities of one who takes such a trip do not begin or end with the actual flight, but include his presence or movements in or near to the machine incidental to beginning or concluding the trip.'

"In the same way, if a flight is interrupted by mechanical trouble necessitating an involuntary, or forced, landing, the interval during which the craft is supported by the watery element instead of the air is as much a part of the flying trip as any other. We are clearly of the opinion that the clause in controversy applies to aircraft in the situation shown to have existed in this case." (Emphasis in context.)

See also Walden v. Automobile Owners Safety Ins. Co., 228 Ark. 983, 986, 311 S.W.2d 780 (granting plaintiff beneficiary recovery on a policy insuring decedent against accidental injury *while driving or riding in an automobile* where decedent was found drowned about 75 to 100 feet from his car partly submerged in a flooded mining pit); Wright v. Aetna Life Ins. Co., 3 Cir., 10 F.2d 281, 46 A.L.R. 225.

When submitted, the case at bar was in much the same posture as was the foregoing Missouri case except there the submission occurred at the close of the plaintiff's case in chief instead of as here upon the close of all the evidence; but that makes no difference because in each instance the evidence was not in dispute, and in this case the material evidence adduced by defendant to support its case in chief was in its effect essentially the same as that introduced by plaintiff to prove

her case in chief. The Trial Court here was not required to decide any factual issue but only whether the provisions of the aviation exclusion clause barred plaintiff's recovery on the policy.

■ In this case the Trial Court concluded not only "that the facts are not in dispute" but also "that the words and language of the aviation exclusion clause are not ambiguous" all of which we find to be true. And we think the Trial Court properly ruled that there was no factual question to be submitted to the jury. Upon the close of all the evidence the only question to be decided was whether the policy's exclusion clause in its plain and unambiguous meaning barred appellant's recovery upon the undisputed facts and those assumed by the Trial Court to be true, and that was a question of law for court decision, which in this case was correctly made.

■ In her briefs and oral argument, plaintiff contends that the Trial Court, by ruling that the plane's crashing into the lake was the "predominant cause" of the decedent Rauch's death, erroneously treated the exclusion clause as if it excluded insurance coverage for death *resulting* from the prohibited aircraft service, instead of barring coverage for death occurring, as the policy requires, *while* the insured was engaged in the prohibited service, but we do not agree. In that connection the Court used the words "predominant cause" in considering the relation between the principal events in the occurrence of Mr. Rauch's death in order to determine whether death occurred *while* he was rendering the prohibited service, not in order to find whether death as the proximate end result was proximately caused by or *resulted* from the crash. For that purpose the Trial Court did not err in its use of "predominant cause".

■ We hold that the aeronautic activities of decedent Rauch did not end with the actual flight initiated by him, but included his voluntary or involuntary presence and movements in the lake water near the plane following its crash, as

disclosed by the evidence. We agree with the Trial Court in holding that decedent Rauch's death occurred *while* operating and serving as a member of the crew of the airplane which crashed into Fish Lake and that appellant beneficiary's recovery on the policy is barred by its aviation exclusion clause.

We find no error in the Trial Court's rejection of plaintiff's Exhibit 2, the coroner's certificate, stating the cause of decedent Rauch's death was drowning, which the Court ruled was merely the inadmissible opinion or conclusion of the coroner. Liljeblom v. Dept., etc., 57 Wn.(2d) 136, 356 P.2d 307; New York Life Ins. Co. v. Taylor, 79 U.S. App.D.C. 66, 147 F.2d 297; Olender v. United States, 9 Cir., 210 F.2d 795, 802, 42 A.L.R.2d 736. A further reason for our finding no error as to the Exhibit 2 rejection is that appellant has not been prejudiced by the Trial Court's ruling because it assumed as true all that appellant sought to prove by Exhibit 2,— that Mr. Rauch was drowned.

We have considered all of appellant's assigned errors, but find no merit in them. All of the court findings and conclusions assigned by appellant as erroneous are supported by sufficient evidence and reasonable inferences to be drawn therefrom.

The Trial Court's orders rejecting appellant's offer of plaintiff's Exhibit 2, denying a directed verdict for appellant, directing a verdict in appellee's favor and dismissing appellant's action are AFFIRMED.

In view of our foregoing disposition of appellant's appeal, we do not reach appellee's point III Argument that appellant, because she did not move for a new trial or other relief as provided by F.R. Civ.P. 50(b), cannot seek on this appeal our judgment in her favor.

DUNIWAY, Circuit Judge.

I dissent. If the policy here involved were drawn in terms of causation, I would have no doubt that the result reached by Judge BOWEN in his opinion is correct. The language of this policy, however, is peculiar. It insures against "bodily injury which shall occasion death," and that phrase is expressly defined as follows:

" 'BODILY INJURY WHICH SHALL OCCASION DEATH' includes, in addition to the coverage herein provided, death by exposure to the elements or physical exhaustion or drowning resulting from *an accident or mechanical or other failure of anything used as a means of conveyance or transportation.*" (Emphasis added.)

It will be noted that drowning resulting from the causes defined is covered. The particular exclusion with which we are concerned is contained in a paragraph that lists a number of exclusions. The precise language is: "This Certificate does not cover death * * *

"(a) Directly or indirectly caused or contributed to" by war, etc.;

"(b) Directly or indirectly caused or contributed to" by intentional self-injury, disease, etc.;

"(c) Directly or indirectly resulting from" medical treatment;

"(d) Resulting from the Assured's own criminal acts";

"(e) * * * while the Assured is operating * * * or serving as a member of a crew of an aircraft."

It will be noted that exclusions (a) through (d) are all cast in terms of causation. Exclusion (e), the one here involved, is not so cast. It applies "while."

Bearing in mind the familiar rule that a policy is to be construed against the insurance company which prepared it, a rule which is reinforced in this case by a second rule, that exclusions are to be narrowly construed (see Brown v. Underwriters at Lloyd's, 1958, 53 Wash.2d 142, 332 P.2d 228), I am of the opinion that the case before us should have been given to the jury.

Both the trial judge and Judge BOWEN conclude that the evidence would per-

mit a finding that the decedent did not suffer a fatal injury while he was operating the airplane; that is, up to the time when the plane had finally come to rest at the bottom of the lake. The physical evidence is, as Judge BOWEN states, undisputed, but more than one inference can be drawn from it. It is for the jury to draw inferences. Here it could infer that the decedent got out of the plane and clear of it, and that his death occurred thereafter, by drowning. I also think that if the jury should so find, the decedent would no longer at that time have been "operating or serving as a member of the crew" of the plane. There is a time at which such activities cease at the end of a flight. Because the policy was drawn by the insurance company and because the language is exclusionary, I think that we should hold that that time is when the decedent got out of the airplane, even though the peril to which he was subjected by reason of the plane's landing in the water was still present.

I note that in the case of Wendorff v. Missouri State Life Ins. Co., 1927, 318 Mo. 363, 1 S.W.2d 99, 57 A.L.R. 615, the policy language is quite different. There the exclusion not only covers injury sustained while in or on an airplane, but also injuries sustained in falling therefrom or therewith. No such language appears in the present policy. It would appear that exclusion (e) was deliberately drawn to eliminate causation as a factor determining whether the exclusion applies. It is easy to say that the drowning which the jury might find to be the cause of death was "directly or indirectly caused or contributed to" by operating or serving as a member of the crew of the aircraft and there would be no doubt about the proper result in this case if exclusion (e) had been so phrased. The problem is that it was not so phrased and presumably, particularly since it is a part of the same paragraph of the policy, the difference in phrasing was intentional.

I agree with the conclusion that the Coroner's certificate was properly exclud-

ed from evidence. The record shows that it was filled out by a Dr. Butterworth, who had no knowledge of the cause of death, but obtained his information from a Mr. Ward, who was not qualified to express an opinion on the subject. Ward appeared at the trial and the court found that he was not so qualified. Thus, this particular certificate was the rankest kind of hearsay.

I would reverse.