Harold L. PEEK, Jr., and Susanna E. Peek, Appellants,

v.

UNITED STATES of America, Appellee.

No. 17973.

United States Court of Appeals Ninth Circuit.

Aug. 14, 1963.

Rehearing Denied for Harold Peek, Jr., Sept. 26, 1963.

Jack E. Tanner and Donald H. McGavick, Tacoma, Wash., for appellant Susanna E. Peek.

George E. Shibley, Long Beach, Cal., for appellant Harold L. Peek.

Brockman Adams, U. S. Atty., and John S. Obenour, Asst. U. S. Atty., Tacoma, Wash., for appellee.

Before BARNES, HAMLIN and BROWNING, Circuit Judges.

BARNES, Circuit Judge.

Appellant Harold L. Peek, Jr. (hereinafter referred to as Peek) was tried and convicted by a jury in the United States District Court for the Western District of Washington under Counts I, II and III of a five count indictment [1] charging in part: In Count I, robbery of United States funds in violation of 18 U.S.C. § 2112; and, in Counts II and III, assault with a dangerous weapon, and wounding in the commission of a robbery of money

---

[1]. On Count IV, an alternative count charging Peek with stealing and converting money of the United States in violation of 18 U.S.C. § 641, the jury returned a verdict of not guilty.

of the United States, in violation of 18 U.S.C. § 2114.[2]

Appellant Susanna E. Peek (wife of Peek and hereinafter referred to as Susanna Peek) was tried and convicted in Count V of the same indictment charging her with receiving, concealing and converting stolen money of the United States in violation of 18 U.S.C. § 641.[3]

This court has jurisdiction on appeal under the provisions of 28 U.S.C. § 1291.

### I—JURISDICTION

Peek argues[4] that the district court was without jurisdiction to try him upon the charges made against him, which we must first consider. Peek contends that Congress vested primary or "preferential" jurisdiction of the offenses charged in military tribunals, and that, unless it is made to appear on the record that the military authorities have waived jurisdiction, the civil court has no power to hear the case.

Since the offenses alleged in Counts I through IV of the indictment against Peek were committed on a military reservation, involved only military personnel, and were violations of the Uniform Code of Military Justice,[5] a military tribunal would have jurisdiction. However, United States money was involved, and as indicated in Title 18 of the United States Code, these crimes were also offenses against the United States.[6] The district courts have "original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." 18 U.S.C. § 3231.

To resolve the question of jurisdiction in the instant case, this court need not determine whether a military tribunal has either exclusive, primary or "preferential" or concurrent jurisdiction.

Article 14(a) of the Uniform Code of Military Justice (10 U.S.C. § 814) states:

"(a) Under such regulations as the Secretary concerned may prescribe, a member of the armed forces accused of an offense against civil authority may be delivered, upon request, to the civil authority for trial."

Basically, Peek contends that a requisite of the "delivery" mentioned in § 814 (a) is that the record shows that the military authorities have waived jurisdiction. Reference is made to Ex Parte King, E.D.Ky.1917, 246 F. 868, in which the court was called upon to interpret certain articles of war. King, a private, was indicted for killing a civil policeman; at the time of the killing, the United States was at war with Germany. The court concluded that Article of War 92 (which provided that any person subject to military law who committed murder or rape would suffer death or life imprisonment as a court-martial should direct) would not apply to murder committed in the United States in time of peace, conferred prior, if not exclusive jurisdiction on military authorities. And, the court held that King should be delivered from civil custody back to the military authorities because there was no showing that the military personnel who delivered King to civil custody had authority to waive the prior jurisdiction of the military authorities; and, in the absence of this, the prior jurisdiction had to be recognized. The statute in Ex Parte

---

2. Peek was sentenced to fifteen years imprisonment on Count I and to twenty-five years on Counts II and III, all to run concurrently.

3. Susanna Peek was sentenced to two years imprisonment on Count V, but, four months later, the district court suspended the remainder of this sentence and imposed probation for five years.

4. Opening briefs were filed on behalf of both Peek and Susanna Peek by their trial counsel; thereafter there was a sub-

stitution of counsel for Peek, with the substituted counsel filing a "Supplemental Opening Brief" and a "Supplemental Closing Brief" on behalf of Peek only. Hereafter, when arguments of Peek and Susanna Peek are indicated, reference is being made to the former briefs, and when arguments of only Peek are indicated, reference is being made to the latter briefs.

5. See 10 U.S.C. §§ 908, 921, 922 and 923.

6. See 18 U.S.C. §§ 2112, 2114 and 641.

King expressly conferred primary jurisdiction in the military in time of war but only as to certain named offenses. It is not analogous to Article 14(a).

Article 14(a) does not establish, or even indicate, a hierarchy of jurisdiction as between civil and military authorities. It merely provides, that, upon request, a member of the armed forces who is accused of an offense against civil authority may be delivered to the civil authority for trial. If the civil authority had jurisdiction and the member of the armed forces was delivered to that authority, jurisdiction in the civil authority is established.

In the instant case, both of these requisites have been met.

## II—THE PRODUCTS OF AN ALLEGED ILLEGAL SEARCH AND SEIZURE

Peek and his wife next urge that the district court was in error in allowing F.B.I. Agent Elgin Olrogg to testify as to conversations had with Susanna Peek during an illegal search and seizure on January 14, 1961, and as to conversation subsequently had with her concerning information that was obtained as a result of an illegal search and seizure as to Susanna Peek (Valid as to Peek) made on January 14, 1961.

Appellants refer to the following portions of the record:

Olrogg testified that prior to January 14, 1961, Peek had executed a written consent to search his residence; and, that while he was in the Peek home on January 14, 1961, Susanna Peek said that in November and December of 1960 her husband brought home approximately $110 each month which he said he won gambling at Fort Lewis, the military reservation on which the robbery took place. At this point, appellants' counsel objected, moved to strike all of Olrogg's testimony, and asked to be heard; the court then excused the jury. (R. 625–30.) The court, in the absence of the jury, asked counsel to research the question of whether or not the consent of the husband to the search of the domicile of a married couple is sufficient to constitute consent by the wife, where the wife is codefendant and is charged with offenses connected with material discovered in the premises. (R. 635.) And, when the jury returned, the court advised them to disregard the testimony of Olrogg, and ordered it stricken. (R. 640.)

Later in the trial, before Olrogg was to testify again, and while the jury was absent, government counsel indicated that he proposed to question Olrogg about a second consent to search executed by Peek, and a search thereunder on January 17, 1961. Counsel for appellants indicated that he would again raise the objection that was made as to the testimony relating to the January 14, 1961, search. To counsel for appellants, the court said:

"My feeling about it at the present time is this, that inasmuch as there is no specific and direct evidence of consent by Mrs. Peek to the entry of the home, although there is strong inference of consent and approval, still there is no direct expression of it, and also there might possibly be some question about it due to the principles applicable to a woman acting as result of actions or instructions, or the like, from her husband.

"In these circumstances, I am constrained to sustain the objection to whatever search may have been made on that day [January 14, 1961]. Statements made, and the like, I think are admissible. I do not agree with your view of that, and to that extent the objection will be overruled and exception allowed. But as far as any conduct of any search on that occasion, the objection will be sustained, the objection will be sustained, at least on the present showing." (R. 1048–49.)

The court further ruled that objections would be sustained as to any items taken in the January 14, 1961, search found applicable to Susanna Peek, but that there would be no objection to items taken

with respect to Peek. Thereupon, Olrogg was allowed to take the stand to state that items taken on January 14, 1961, pertained only to Peek. Counsel for appellants then moved to strike any testimony given by Olrogg as to January 14, 1961, and "any subsequent testimony as to any leads that grew out of that particular contact as to Mrs. Peek. * * *" (R. 1049–51.)

With the jury still absent, the court heard this further testimony by Olrogg:

"Q. On that occasion [January 14, 1961] what was the general matter that you discussed with Mrs. Peek other than the search?

"A. The general matter we discussed was the robbery at Fort Lewis and a general accounting as to their finances during the pertinent period of time.

"Q. All right. Now, as to the finances, had the matters that you discussed with Mrs. Peek already been obtained by you and other agents and your credit check that you began on the 12th?

"A. Most of these matters, as I recall, had been covered.

"Q. Did she have a record of these things that she showed you at this time that you had verified from your outside investigation?

"A. Yes.

"Q. And was your conversation with her a verification of the other leads, as you described, against her records of what she spent?

"A. Yes." (R. 1054–55.)

Thereupon, the court decided that "the best and safest way to treat it would be simply to exclude any statements or conversations or anything else occurring on the occasion of the January 14 visit to the house." (R. 1055.) Counsel for appellants renewed his objection to any statements taken from Susanna Peek by Olrogg at any time subsequent to January 14, 1961. The court then made this ruling:

"Your objection will so appear of record. I so understand it, and I now overrule that general objection but will treat the matter as we come along on the basis of the further evidence, if any, to be offered." (R. 1056.)

The one subsequent statement of Susanna Peek pointed to by appellants was a written statement executed by Susanna Peek at the F.B.I. office in Tacoma, Washington, on January 21, 1961. In that statement she said that she was voluntarily making the statement, that she understood her rights, that on the morning after the robbery Peek came home and said he had to paint helmets all night, that shortly thereafter Peek again went back to Fort Lewis and she discovered an envelope in his Army jacket that appeared to be filled with more money than she would expect him to have, that she told him that she did not believe him, that he began to give her money, and that he would go to the shed for the money. (R. 1114–17.)

■ In answering appellants' argument on the question of illegal search and seizure, it is not necessary to determine whether or not the January 14, 1961 search and seizure was illegal as to Susanna Peek; as will be indicated hereafter, if we assume that it was illegal, no error was committed by the district court with respect to it.

As the above lengthy review of the portion of the record referred to by appellants demonstrates, any testimony with respect to the January 14, 1961 search and seizure was either stricken, or heard by the court in the absence of the jury, to aid the court in making its rulings. Thus, this testimony was not before the jury for its consideration. The instant case is unlike Weeks v. United States, 1913, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652, in which the Court held that evidence obtained in an unlawful search and seizure could not be received in a federal prosecution; there the material in question was put in evidence and used against the defendant.

■ As for the written statement of Susanna Peek executed on January 21,

1961, appellants' contention is that it "grew out of a lead or was the result of an illegal search and seizure as to the appellant Susanna E. Peek on January 14, 1961." (Appellants' Amended Brief, pp. 4–5.) All of appellants' references to the record support the opposite conclusion. The testimony of Olrogg relating to what was said by Susanna Peek during the January 14, 1961 search and seizure that was quoted above fails to demonstrate that the written statement was the result of the January 14, 1961 search and seizure. And, when the written statement was introduced into evidence, appellants' objection was not that it grew out of any allegedly illegal search and seizure, but merely that it was coerced. (R. 1069, 1494–97.)[7] It appears from the record that this written statement was voluntary and independent of the January 14, 1961 search and seizure. "If information which could have emerged from an unlawful search in fact stems from an independent source, the evidence is admissible." United States v. Paroutian, 2 Cir., 1962, 299 F.2d 486.

Here the record clearly discloses that there was no "taint"; that no "fruit of the poisonous tree" existed, *in fact*.

## III—REFUSAL TO ORDER INSPECTION

Peek next asserts that the district court's denial of appellants' motion for discovery and inspection of statements of government witnesses and Exhibit 22 in advance of trial was arbitrary and unreasonable and deprived him the due process of law guaranteed by the Fifth Amendment, and of rights secured by the Sixth Amendment, to the United States Constitution.

Counsel for appellants entered a motion for discovery and inspection pursuant to Rule 16, Federal Rules of Criminal Procedure; this motion was considered twice by the district court. The first time was October 16, 1961. At that time the government agreed to furnish the items included under the first paragraph of appellants' motion; some of these had been obtained from the Peek residence, and included a raincoat, boots and guns. The guns, two of which were .45 automatics, were shown to have been purchased by Peek after November 3, 1960, the robbery in the instant case having occurred on November 2, 1960, and were included in the expenditures proved by appellee as having been made by the Peeks between November 3, 1960 and January 31, 1961.

There were three items included under the second paragraph of appellants' motion: (1) All money and money containers of any kind recovered at Fort Lewis; (2) any and all tangible objects that were to be offered at the time of trial; and (3) any and all statements given by witnesses.

On October 16, 1961, the district court denied appellants' motion as to this second paragraph after counsel for appellants indicated that what he desired under this paragraph were statements taken from witnesses. The court said:

" * * * the method of handling this sort of thing is to proceed [in this case] strictly under the socalled Jencks statute, the statute following the Jencks case, and, in my judgment, simply requires that at a reasonable time at or before the actual calling of the witness, his statement should be given to counsel for examination. * · * * " (R. 1426–27.)

The second occasion on which the district court considered appellants' motion for discovery and inspection was December 18, 1961. Counsel for appellants asked to inspect "one .45 caliber automatic that will be used at the time of trial and submitted in evidence," agreeing to so inspect in the presence of an Assistant United States Attorney and an F.B.I. agent. The reason stated for his request was his belief that this weapon would "entail expert testimony, ballistic testimony of some kind." (R. 1429–30.)

---

7. The court specifically held there was no impropriety, much less coercion, of Mrs. Peek by F.B.I. agents.

Appellee resisted this motion on three grounds: First, that this motion was indefinite; second, that there was no provision under the rules for the inspection requested here; and, third, that the integrity of the evidence was required to be safeguarded; i. e., Peek's capacity for fabrication. This involved a peculiar factual situation. Appellee asserted that Peek was a member of a pistol team, a member of the M.P.'s, and had access not only to the weapons known as "Army .45's", but also to interchangeable .45 caliber parts (which as to the Army were expendable); that Peek was capable of producing stories at any pretext and had done so and had retracted them by saying, "They are all false"; that this was a classic example of a motion to inspect that should be denied under Rule 16, because it was clearly in this instance a "fishing expedition," and the means whereby defendant could further concoct additional falsehoods, which would be as false as the ones he had already told government agents before; that it would be a decided hardship and risk to the case of the government because Peek had proved himself capable of fabrication; and, that any additional information he would obtain could only provide the means for Peek to further fabricate his defense. (R. 1430–31.)

Counsel for appellants replied that he failed to see why possible "fabrications" had anything to do with this matter; this .45 was going to be in the possession of the United States Attorney with others present; and, "We are trying to establish the identification of this weapon." (R. 1431–32.)

The district court made the following ruling:

"I think that I should not permit this inspection in advance of the trial. However, if and when a weapon be introduced by the government in the course of the trial, there will be ample opportunity provided for the defense to make its inspection, and if necessary, to conduct any further investigation that may result from the inspection at that time.

"This will be the ruling of the court at this time, the motion is denied with the understanding that ample opportunity will be provided the defendant at such time as a weapon, if any, be presented by the government." (R. 1432.)

■ Peek contends, herein, that "post-testimonial inspection" was untimely, wholly inadequate, and seriously impaired the preparation and presentation of his defenses; and, that the denial of pre-trial inspection of Exhibit 22 and the reports and statements of government witnesses deprived him of a fair trial, the effective assistance of counsel, and the right to obtain witnesses to aid in his defense.

With respect to the statements of government witnesses, the Jencks Act, 18 U.S.C. § 3500, is clear and controlling. It conclusively establishes the correctness of the district court's ruling.[8]

Peek also raises the question of the constitutionality of the Jencks Act. This question has already been answered by Scales v. United States, 1960, 367 U.S. 203, 257–258, 81 S.Ct. 1469, 6 L.Ed.2d 782. There the United States Supreme Court held that the procedure set forth in the Jencks statute did not violate the Constitution.

■ But, Peek further argues that the statute was incorrectly applied in his case. He asserts that the district court erred in considering F.B.I. ballistics expert Poppleton (who submitted certain ballistics reports to the F.B.I. office in Tacoma, Washington), a "Government witness"; or any one of his reports a

8. Subsection (a) of this Act states:

"In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) to an agent of the Government shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."

"statement or report" within the meaning of the Jencks Act. In Holmes v. United States, 4 Cir., 1959, 271 F.2d 635, one of the principal witnesses for the government was an F.B.I. agent; the defense had demanded the production of reports prepared by him during his investigation and recording its result, but the government contended that the Jencks Act did not apply to statements prepared by a government agent who becomes a witness at the trial. The court held that the written report of the F.B.I. agent "is a statement within the literal and evident meaning of subsection (e) of the [Jencks] Act." And, "we can find nothing in the Jencks Act which suggests that defense counsel are entitled to no statement of the witness, simply because he happens to be an agent of the F.B.I." Id., 271 F.2d at 638. The thrust of Peek's argument apparently is that if an F.B.I. agent and his report were without the Jencks Act, he would be entitled to full discovery and inspection. Peek suffers from a misconception; "statements of a government witness made to an agent of the Government which cannot be produced under the terms of 18 U.S.C. § 3500 [the Jencks Act] cannot be produced at all." Palermo v. United States, 1958, 360 U.S. 343, 351, 79 S.Ct. 1217, 1224, 3 L.Ed.2d 1287.

The district court's ruling with respect to Exhibit 22 was made pursuant to Rule 16 of the Federal Rules of Criminal Procedure.[9]

█ Appellee contends that this particular Exhibit, a .45 automatic, was not obtained from Peek, did not belong to him, and was not obtained from others "by seizure or by process;" and, hence, it was not subject to inspection under Rule 16.

Peek had "signed for" this gun as a member of the pistol team; he was authorized to keep it in his possession at night since he lived off post. (R. 1239.) Under orders, on approximately November 15, 1960, Peek "turned this gun back in to the armorer" at Fort Lewis. (R. 1243.) And, on January 23, 1961, this same gun was "turned over" to the F.B.I. "for test-firing and comparison, re possible evidence;" a receipt for the gun was executed by goverment agents and was given to the person from whom it was "obtained," Sergeant First Class Wells, the noncommissioned officer in charge of the pistol team. (R. 1238–39.)

This gun, then, was not obtained from Peek, and, when it was turned back to the armorer under orders, it could no longer be considered as "belonging" [10] to him.

But, was it obtained from the Army "by seizure or by process?" Because the government obtained possession of Exhibit 22 on January 23, 1961, and retained it, it might be said that Peek was prevented from securing it, and that, therefore, Exhibit 22 was "obtained from others by * * * process." Cf. United States v. Chandler, D.C.Mass.1947, 7 F.R.D. 365.

Controlling here, however, is the general rule that a motion under Rule 16 is addressed to the discretion of the court. United States v. Kiamie, D.C.N.Y.1955, 18 F.R.D. 421. This court has recognized the most common definition in law of the word "discretion":

"The power exercised by courts to determine questions to which no strict rule of law is applicable but which, from their nature, and the circumstances of the case are controlled by the personal judgment of

---

9. This rule states, in part:
 "Upon motion of a defendant at any time after the filing of the indictment or information, the court may order the attorney for the government to permit the defendant to inspect and copy or photograph designated books, papers, documents or tangible objects, *obtained from or belonging to the defendant* or *obtained from others by seizure*

*or by process*, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable." (Emphasis added.)

10. "Belong" has two general meanings: (1) ownership; and, (2) less than ownership, e. g., the absolute right of a user. Black, Law Dictionary 198 (1951).

the court." 1 Bouv.Law Dict., Rawles' Third Revision, p. 884.

Such discretionary judicial action is said to be final and cannot be set aside on appeal except when there is an abuse of discretion. And discretion, in this sense, is abused:

> "* * * when the judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." Delno v. Market St. Ry. Co., 9 Cir., 1942, 124 F.2d 965, 967.

In the instant case, it cannot be said that no reasonable man would take the view adopted by the trial court. Peek's counsel knew the guns involved in the robbery were .45 caliber; he could have prepared himself on the ballistics aspects of the case, and could have had a ballistics expert ready to make an inspection and test-firing when Exhibit 22 was made available to him at the trial. The court in its ruling of December 18, 1961, stated that when and if Exhibit 22 was introduced into evidence, the court would provide "ample opportunity for the defense to make its inspection, and if necessary, to conduct any further investigation." (R. 1432.) Never was such a request made by appellant. The court, based on appellee's argument before the December 18, 1961 ruling, may have concluded that Peek's aim was a "fishing expedition" rather than a quest for vital trial preparation information. At most, it could be said that reasonable men might differ. We find and hold there was no abuse of discretion in the court's ruling as he did, to preserve the integrity of the Exhibit. (R. 1432.)

Peek's final contention with respect to appellant's motion for discovery and inspection is that the district court was in error in not exercising its "inherent power in favor of granting inspection in order to insure the appellant of a fair trial." (Supplemental Closing Brief of Appellant Harold L. Peek, Jr., pp. 36–39.) In United States v. Duncan, S.D. N.Y.1958, 22 F.R.D. 295, the court expresses the view that quite apart from Rules 16 and 17(c) the court possesses inherent authority to grant requests for production of material.[11] The district court "has discretion, independent of the Rules discussed [Rules 16 and 17(c)], to permit inspection in situations where a denial of the request would subject the defendant to unreasonable hardship in the preparation of his case." Id. 22 F.R.D. at 299. Since discretion would still exist in the district court were this view to be recognized in the instant case, the result would be the same.

## IV—SEVERANCE

■■ Peek and Susanna Peek both urge that the district court should have granted their pre-trial motion for severance. The granting of such motion is within the discretion of the district court. United States v. Lebron, 2 Cir., 1955, 222 F.2d 531. Appellants asked for severance because they felt the government would use certain statements made by one appellant against the other in the trial and thereby violate the privilege relating to communications between husband and wife and the prohibition of one spouse giving evidence against the other. Certainly there was the possibility that the government would attempt to enter such statements into evidence, with the further possibility that were they successful these statements would be so prejudicial as to require a severance, but these questions were properly left for determination at trial.[12] In the

---

11. Cf. United States v. Palermo, S.D.N.Y. 1957, 21 F.R.D. 11, 13, where the court said: "The only rights of pre-trial discovery given to a defendant in a criminal case are those in Rules 16 and 17(c) of the Federal Rules of Criminal Procedure."

12. A similar position was taken by the district court in United States v. Van Allen, S.D.N.Y.1961, 28 F.R.D. 329.

instant case, the district court stated that should prejudice to either defendant become manifest on trial, it would be free to deal with it by discretionary action. (R. 1500.) There was no error in the denial of appellants' pre-trial motion for severance.

## V—EXTRA-JUDICIAL STATEMENTS

 Peek and Susanna Peek further assert that during the trial the district court erred in allowing the government to introduce in evidence "various extra-judicial statements that one spouse made to various federal agents and others." (Appellants Amended Brief, p. 10.) The rule that a husband or wife who seeks to testify *in behalf of* his or her spouse is disqualified as a witness has been abolished in the federal courts. What remains is the rule that a husband or wife cannot be *compelled* to testify *against* his or her spouse, and cannot be *permitted* to do so unless the other spouse consents. This rule is one of privilege, and the privilege may be waived. Olender v. United States, 9 Cir., 1954, 210 F.2d 795, 42 A.L.R.2d 736. And this privilege includes the prohibition against a third person relating a statement made by one spouse against the other which that spouse would not be allowed to relate if called as a witness. See United States v. Winfree, E.D.Penn.1959, 170 F.Supp. 659.

 The extra-judicial statements of Peek and Susanna Peek were received only as against the person who made them. Moreover, we are satisfied that they were either not prejudicial to the other spouse or were made with his or her voluntary consent. All of Peek's extra-judicial statements were exculpatory of Susanna. All of Susanna's statements, except one, either supported the theory of Peek's defense or simply repeated statements which Peek admitted having made to his wife. The single exception was a statement made by Susanna Peek to an agent of the F.B.I. on January 17, 1961.

F.B.I. agent Olrogg testified that during his January 17, 1961 search of the Peek home, Susanna Peek had said "that her husband had told her that he had put some money behind the toilet paper receptacle in their home for her to use in case something happened to him." (R. 1062.) And she had further said, (concerning $800 discovered behind the toilet paper receptacle) that she had not seen it before, but that on November 3, 1961, she had discovered an envelope containing money in the inner pocket of her husband's Army uniform; also, that during November and December when she had occasion to ask her husband for money to pay bills, he would go to a shed at the rear of their house and return with certain sums of money. (R. 1072–73.)

This testimony was against Peek, but Peek had waived his right to object to its being admitted. On January 16, 1961, government agents had a talk with both appellants at the C.I.D. (Criminal Investigation Division of the Military Police) office. Both were present when Susanna Peek, in response to questioning, said that she had heard about the robbery on the radio; that she had asked Peek about it the next morning when he came home; that she later discovered money in his pocket in an envelope; that when he came home she confronted him with it and told him she suspected him of having participated in the robbery; that he had told her he buried part of the robbery money in a cemetery; that there was some money behind the toilet tissue fixture in the bathroom (Peek interrupted at this point to say this money had been spent); and, that Peek also had money out in the shed attached to the house. (R. 434–39.) The record would indicate that these statements were freely and voluntarily given by Susanna Peek with the knowledge and consent of Peek.

The final extra-judicial statement referred to by appellants is the written statement executed by Susanna Peek at the F.B.I. office in Tacoma, Washington, on January 21, 1961; the contents of this statement have been set forth above. This writing is a restatement of the substance of Susanna Peek's comments dur-

ing the prior questioning of January 16, 1961, attended by Peek; for the reasons stated in the preceding paragraph, Peek also had waived his right to object to this writing. We find no error in admitting any of these statements.

## VI—EFFECTIVE REPRESENTATION

Peek further alleges that he was denied his Sixth Amendment right to effective assistance of counsel for three reasons. The first is that a conflict of interest existed between Peek and Susanna Peek which prevented their joint trial counsel from giving to either his undivided loyalty. It is well recognized in the federal courts that the existence of a conflict of interest on the part of counsel representing two different defendants deprives the accused of the effective assistance of counsel; decisions dealing with the question of whether or not a conflict of interest existed have turned on the particular fact situation of each case.[13] In the instant case, Peek was charged with the robbery and conversion, and Susanna Peek with conversion. No factor in the nature of the offenses charged, or in the actual conduct of the trial indicate that counsel for appellants had to, or that he in fact did, slight the defense of one defendant for that of the other. The interests of appellants were not in conflict with each other. When called upon at oral argument to point out where this conflict existed, none could be shown this court.

The second reason urged is that defendants' trial counsel was inexperienced and confused—"overwhelmed." To constitute denial of the effective assistance of counsel guaranteed by the Sixth Amendment counsel must have been so incompetent or inefficient as to make the trial a farce or a mockery of justice. Stanley v. United States, 9 Cir., 1956, 239 F.2d 765. None of Peek's references to the record, nor their sum total amount to a situation even approaching what was contemplated as a requisite in the Stanley case.[14] We have also had the opportunity to observe counsel on this appeal. We have no hesitancy in saying this ground urged is without any substantial foundation.

The third reason urged to establish the ineffective assistance of counsel is a breach of ethics by Peek's first counsel "which so impaired his defenses as to render the assistance of his second attorney ineffectual." (Supplemental Opening Brief of Appellant Harold L. Peek, Jr., p. 50.) The "breach of ethics" relied on was the agreement by appellants' first counsel (who was substituted out prior to trial after receiving judicial appointment) to allow appellants to be interviewed by a newspaper reporter in counsel's office. During this interview, appellants complained of their financial difficulties; Peek said he found the robbery money near the Military Police firing range at Fort Lewis; that he had taken the money home and put it in an envelope in his Army jacket; that he was near the firing range on the night of the robbery because he was painting helmets in a building nearby; that he felt that it may have been wrong to keep the mon-

---

13. See Glasser v. United States, 1941, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680, a conspiracy case in which "liberal rules of evidence and the wide latitude accorded the prosecution may, and sometimes do, operate unfairly against an individual defendant," and where the trial court denied a defendant's request for separate counsel; Case v. State of North Carolina, 4 Cir., 1963, 315 F.2d 743, a rape case in which one defendant, an uncle of the other who had an I.Q. of about eighty, whereas his nephew had one of about fifty, had on him the "onus of leader-

ship;" and, Craig v. United States, 6 Cir., 1954, 217 F.2d 355, where counsel was prevented from conducting a proper cross-examination of a material witness.

14. Peek's references are to the cross-examination of F.B.I. ballistics expert Poppleton by Peek's trial counsel (R. 1311–14, 1320–51); comments of Peek's trial counsel to the effect that he is "confused" (R. 45, 1226, 1237, 1317), and "getting tired" (R. 1037–39); and, shortly after being substituted in, a request by Peek's trial counsel for a continuance (R. 1423).

ey, but his first thought was his family; and, Mrs. Peek said she felt it was wrong to keep it, and told where in and around the Peek home the money had been kept. (R. 608–20.) Such conduct by appellants' first counsel was part of that counsel's trial strategy; it was an attempt to aid the defendants; it was anything but a manifestation of such a degree of incompetence or inefficiency as to make the trial "a farce or a mockery of justice." Questions concerning the ethics of such conduct by an attorney are for another forum to resolve. We find no merit in this point.

## VII—SUFFICIENCY OF THE EVIDENCE

Finally, Peek contends that the government's evidence was insufficient to permit the jury to find him guilty of the charges against him. It is not for this court to weigh the evidence or to determine the credibility of witnesses; the verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the government, to support it. Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.[15]

This is a long record, and the case against the appellants at times was confusing and leaves room for argument, but not doubt, when the substantial evidence, much of it technical and much of it circumstantial, is weighed as we must weigh it, most favorable to the government. We are left with no question but that there was ample evidence before the jury upon which to find defendants guilty. We find no error, and we affirm.

BROWNING, Circuit Judge (concurring).

It is unlikely that any one of the cases in which this Court has reversed action

15. In the instant case, the record shows that Peek prior to the robbery had acted as escort to the Commissary courier on a "money run" similar to the one involved in the robbery of November 2, 1960; that men named by Peek as persons who would verify his presence in the supply room at the time of the robbery denied seeing Peek at that time; that Peek had acquired interchangeable parts to a .45 automatic (the caliber of gun used by the robber) prior to the robbery. There was testimony by Sgt. Wells, coach of the pistol team, that (1) Peek was issued a particular .45 automatic on October 7, 1960, (2) Peek was authorized by Wells to change the slide, barrel, and bushing on this gun sometime between October 15–20, 1960, (3) the barrel on this gun at the time of trial was not the barrel put on the gun in October 1960 by Peek, (4) but the slide was the same one put on by Peek in October 1960, (5) that this gun was in Peek's possession between October 7, 1960 and about November 12, 1960, except for a short time after November 2, 1960, when the gun was turned in for a test-firing after which it was returned to Peek, and (6) that at the time of trial the gun was in the same condition as when received from Peek on about November 12, 1960; that human hairs found in a fatigue hat left by the robber in an automobile involved in the robbery, though in some respects dissimilar to Peek's hair, were not so dissimilar as to entirely eliminate Peek as the source of the hairs; that, although the military serial number in the fatigue hat left by the robber had been obliterated, laboratory restoration attempts indicated one of several possible combinations of numbers that could be the serial number originally in the hat was "P–6754;" that Peek's serial number was P–6104; and, that although the results of the test-firing of the gun issued to Peek, when this gun was still in Peek's possession prior to November 12, 1960, did not indicate that the bullets fired from the robber's gun were fired from Peek's gun, tests on this gun after November 12, 1960 indicated that bullets fired from the robber's gun were not fired from the barrel then on Peek's gun, nor were the extractor marks on the casings left by the robber at the scene made from the extractors then on Peek's gun, but that the *breech face mark* on the casing left by the robber were those from Peek's gun; that the breech block was an integral part of the slide and not interchangeable or removable from the gun, as were the ejector, the extractor, the firing pin and the barrel, all of which could leave distinctive marks; that Peek knew and believed that the ejector, extractor, firing pin and barrel could leave marks, but did not know the breech face could do so. This evidence was substantial, and supports the verdict of the jury.

taken by a District Court in the exercise of discretion involved conduct so clearly wrong that "no reasonable man would take the view adopted by the trial court." Certainly Judge Boldt's order with respect to the inspection of Exhibit 22 does not require the protection of so stringent a standard. The test is whether on the whole record the reviewing court " 'has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.' " Dillon v. United States, 307 F.2d 445, 448 (9th Cir., 1962). Judge Boldt's order met this test for it was reasonably necessary to protect the integrity of the exhibit, and at the same time preserve to defendants a fair opportunity to inspect the exhibit if, in the light of developments at trial, they should think such inspection desirable.