**Ernest Vivallava PINEDA, Plaintiff,**

v.

**Walter E. CRAVEN, Warden, Defendant.**

**No. C-70 1096.**

United States District Court,
N. D. California.

May 27, 1971.

Sheldon Portman, Public Defender of Santa Clara County, San Jose, Cal., for plaintiff.

Evelle J. Younger, Atty. Gen. of Cal., John T. Murphy, and George R. Nock, Deputy Attys. Gen., San Francisco, Cal., for defendant.

## MEMORANDUM AND ORDER

PECKHAM, District Judge.

In this action Ernest Pineda, a California prisoner, seeks federal habeas corpus relief from his 1964 conviction in the California Superior Court for possession of heroin. Such relief was initially sought from the United States District Court, for the Eastern District of California, where the petition was denied without an evidentiary hearing. On appeal from that denial, the Ninth Circuit Court of Appeals reversed and remanded, with directions that petitioner was entitled to an evidentiary hearing on the question of whether petitioner's counsel in the state court had deliberately bypassed or waived available state procedures when he failed to raise a possible Fourth Amendment defense. Pineda v. Craven, 424 F.2d 369 (1970). On remand to the Central District, the judge ordered the case transferred to this judicial district since the witnesses needed for the evidentiary hearing reside in this district.

In this court, counsel for petitioner then filed an amended petition for habeas corpus relief, realleging the Fourth Amendment ground and adding thereto a claim of denial of the Sixth Amendment right to the effective assistance of counsel based on evidence first discovered at that time. Also raised was the question of whether the Ninth Circuit opinion had foreclosed consideration of the validity of a 1951 conviction of petitioner, which was admitted as a prior at the 1964 trial and used to enhance the sentence therein. This court issued an order to show cause, to which a return and a traverse were filed. The court then made its pre-hearing order, in which it determined that the proper is-

sues for the evidentiary hearing would be the Fourth Amendment by-pass question and the Sixth Amendment effective counsel issue. Consideration of the 1951 prior was held to be precluded by the Ninth Circuit opinion. The court also indicated that the State of California would be free to attempt to sustain the search that was made in this case as a legal warrantless search, the Ninth Circuit having declared in *Pineda* that the search warrant involved here was plainly invalid under Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). See Order of November 25, 1970. The evidentiary hearing was held on February 10, 1971. After the transcript became available, counsel filed additional briefs. The case stands submitted as of April 22, 1971.

## I. THE BY-PASS ISSUE

Initially, respondent renews the contention that the case of McMann v. Richardson, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970), "revolutionized" the law on deliberate by-pass of state procedures and established a standard inconsistent with the standard used by the Ninth Circuit in its *Pineda* decision wherein an evidentiary hearing on the by-pass issue was ordered. This court rejected this contention in its pre-hearing order, and now re-affirms its conclusion in that regard. *McMann* established the law on the availability of post-conviction relief where the conviction rests on a *guilty plea.* The Supreme Court characterized a guilty plea in certain circumstanes as " * * * nothing less than a refusal to present his

federal claims to the state court in the first instance—a choice by the defendant to take the benefits, if any, of a plea of guilty and then to pursue his coerced-confession claim in collateral proceedings." 397 U.S. at 768, 90 S.Ct. at 1447. The Court concluded that if the plea of guilty—and the "plain by-pass" of a state forum inherent in it—was based on reasonably competent advice of counsel, then collateral attack on the voluntariness of the plea would be precluded. In essence, the Court held that if the guilty plea by-pass of a state forum was an intelligent, rational, deliberate choice through which the defendant hoped to profit, then that defendant should not later be allowed to complain.

■ In the present case, however, Pineda was convicted *after a trial.* In this situation, the very act of going to trial negates the deliberate refusal to present federal claims to the state forum that inheres in the intelligent guilty plea. *McMann* is therefore inapposite; [1] and that decision thus did not erode the mandate of the Ninth Circuit in *Pineda* that an evidentiary hearing be held to resolve the by-pass issue herein.

■ Resolution of the by-pass issue in the present case is a simple matter. The Ninth Circuit pointed out that trial counsel in Pineda's state conviction apparently did not know about Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and that if this ignorance was the reason why counsel did not object to evidence seized pursuant to a search warrant infirm under *Aguilar*, then there would of course have been no

1. A further compelling reason for the conclusion that *McMann* is inapposite in the case of this defendant is, as was stated in this court's pre-hearing order, that a conviction after a trial rests in part on the evidence which was allegedly seized in violation of the Fourth Amendment, whereas a conviction upon a guilty plea rests upon the plea itself. In *McMann*, the Court stated the distinction this way:

A conviction after trial in which a coerced confession is introduced rests in part on the coerced confession, a con-

stitutionally unacceptable basis for conviction. It is that conviction and the confession on which it rests that the defendant later attacks in collateral proceedings. The defendant who pleads guilty is in a different posture. He is convicted on his counseled admission in open court that he committed the crime charged against him. The prior confession is not the basis for the judgment, has never been offered in evidence at a trial, and may never be offered in evidence.

deliberate by-pass or waiver. 424 F.2d at 372. The testimony of petitioner's trial attorney, adduced at the evidentiary hearing, has established that he was in fact unaware of the *Aguilar* decision, and that this was therefore the reason for his failure to object to the introduction of evidence seized pursuant to the invalid search warrant. (RT 11). Accordingly, this court concludes that there was no deliberate by-pass or waiver of this federal claim, and that it is thus cognizable in these proceedings.

## II. THE SEARCH-AND-SEIZURE ISSUE

The essential facts surrounding the search and seizure are these: Stanley Shaver, a member of the narcotics detail of the Santa Clara County Sheriff's Office, participated in the arrest of petitioner and the execution of the (invalid) search warrant on August 3, 1964. (RT 48). Sometime in the latter part of July, 1964, detective Shaver received information from a confidential informant that petitioner's brother, Charlie Pineda, was in possession of heroin and had been dealing in it. (RT 51). The informant told Mr. Shaver that he had purchased heroin from Charlie Pineda, and that Charlie Pineda's house on Chestnut Street in Gilroy contained heroin. (RT 52). The informant had proven reliable in the past, having given information which had resulted in arrests and convictions several times. (RT 49–50). The informant had not passed any false information to Shaver at any time. (RT 50). Detective Shaver could not recall the date on which the informant had allegedly purchased heroin from Charlie Pineda, (RT 58), but testified that it was his policy to procure a search warrant within 10 days from the date of receiving such information. (RT 57–58).

On the evening of August 3, 1964, sometime shortly after dark, Shaver and other officers put Charlie Pineda's house under surveillance. (RT 52, 59). They were about one-half block away. While observing the house, a vehicle in which Shaver had previously seen Charlie Pine-da pulled into the driveway. Someone alighted from the car and entered the house. (RT 52, 53). Given the darkness and the distance, detective Shaver was unable to·recognize the person. This person did not leave the residence prior to the raid which ensued.

When the detectives entered the residence, they did not knock; nor was there a prior announcement of identity and purpose. It was only as the front door was opened that detective Shaver stated that they were police officers; that they had a search warrant; and that no one should move. (RT 54). The reason for the unannounced entry was that in his experience, the narcotics inside the house would be disposed of if a request to enter were first tendered. (RT 54).

The occupants of the house—including Charlie Pineda and his brother Ernest, the petitioner herein—were arrested. Heroin and accompanying paraphernalia were seized as contraband and used to convict petitioner.

## A. PROBABLE CAUSE FOR THE ARREST

Petitioner advances several theories on which the search was invalid. Two of these theories can be easily disposed of. The first is that there was no probable cause for the arrest (and thus the contemporaneous search was also invalid) since the officers did not have a reasonable basis to believe that Charlie Pineda was in the house. See Cal.P.C. § 844. This contention is patently incorrect. As a starting point, the Court of Appeals for the District of Columbia has stated in a search and seizure case that: "[C]oncepts of probable cause and reasonableness prima facie justify looking for a man at home after 10 p. m." Dorman v. United States, 435 F.2d 385, D.C. Cir., 1970, on rehearing en banc, at p. 15 of slip opinion. (Appendix A to petitioner's memorandum of points and authorities following evidentiary hearing). In the present case, in addition to the fact that it was nighttime and the house was

known to the officers as Charles Pineda's house, there was also the car which pulled into the driveway and the person who went into the house therefrom. And this was the car in which Charlie Pineda had been seen previously by detective Shaver. In these circumstances, the officers who raided the house had an eminently reasonable basis to believe that Charlie Pineda was in his house.

█ Further, the court is of the view that the police had probable cause to arrest Charlie Pineda. From a reliable informer, they had information that Charlie possessed heroin; that he sold heroin to the informer; and that he kept heroin in his house. The informer had personal knowledge of these facts—having bought heroin from Charlie, and having seen heroin in his house—and directly communicated this information to the officers who participated in the arrest. There was thus abundant probable cause to arrest Charlie Pineda.

It is true that on cross-examination at the evidentiary hearing, detective Shaver testified that at the time preceding the arrest, he did not feel that he had "enough" to make an arrest of Charlie Pineda. (RT 63). That is, his opinion at the time was that he did not have probable cause to arrest. In the circumstances of this case, however, this court does not regard the opinion or subjective intent of the arresting officers as material. They were possessed of information which, when viewed objectively, did in fact constitute probable cause for the arrest. This validates the arrest. In Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), the Supreme Court stated that "[p]robable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." 361 U.S. at 102, 80 S.Ct. at 171. This language deliberately and carefully incorporates an objective test for probable cause. This is made especially clear by the Court's immediately preceding statement that a good faith belief in probable cause will not suffice to make a valid arrest if in fact (i. e., objectively) probable cause did not exist. This court thus concludes that the belief of detective Shaver that probable cause did not exist does not vitiate the arrest of Charlie Pineda. See Sirimarco v. United States, 315 F.2d 699 (Tenth Cir. 1963).[2]

## B. MOTIVES OF ARRESTING OFFICERS

Another theory which petitioner advances in the hope of invalidating the search is that the arrest of Charlie Pineda was deliberately delayed until he entered the house, and that therefore the search cannot be justified as reasonably incident to a lawful arrest. Petitioner concedes that the officers did not make the arrest as a pretext for the search. If they had, the search could not be sustained. See discussion in Williams v. United States, 418 F.2d 159, 161 (Ninth Cir. 1969). Petitioner nonetheless contends that if the court upholds the "maneuver" in this case of waiting until Charlie entered his house, then the court will be sanctioning what is in effect the same result as the "pretext" cases.

██ With this argument the court cannot agree. In analyzing a "pretext" or "maneuver" case—as opposed to an inquiry regarding probable cause—the focus of the analysis *is* the motive or intent of the officers. Williams v. United States, *supra.* And in the instant case, the overriding facts concerning motive are that the officers were in possession of a search warrant which they believed valid, and which they believed entitled them to enter the house at any time, and that the officers believed they had no right to arrest Charlie Pineda prior to the raid. Thus, they did not delay his

---

2. The present case is particularly interesting, since the police entered the house to execute what they believed to be a valid nighttime search warrant. But since the warrant was in fact invalid under Aguilar v. Texas (Pineda v. Craven, 424 F.2d 369, 371) the good faith of the officers is not sufficient to sustain the search. This again is to apply an objective standard.

arrest, since they felt they could not arrest him, and when they entered the house, it was in order to execute the search warrant. In these circumstances, the court finds no objectionable police conduct which should be deterred, as in the "pretext" cases.[3]

## C. METHOD OF ARREST

■ A more substantial argument of petitioner's is that the unannounced entry into the suspect's home was not a valid arrest under state law, or that if it was, then it was nonetheless violative of the Fourth Amendment. That is, the argument is made that the method of arrest, in contradistinction to the basis for arrest, caused the arrest to be unlawful (and thereby vitiated the accompanying search). The lawfulnesss of the arrest is to be assessed in terms of the applicable state law, subject, of course, to the Federal Constitution. Ker v. California, 374 U.S. 23, 37, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). The California Penal Code provided at the time of the arrest herein (and still provides) as follows:

> § 844. *Breaking open door or window to effect arrest; demand for admittance; explanation of purpose.*
>
> To make an arrest, a private person, if the offense be a felony, and in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired.

The respondent concedes that in the present case, the officers did not comply with this statute. But respondent argues that California decisional law as

of 1964 had engrafted onto this section a rule which excused noncompliance with the statute in situations where the officers were reasonably fearful that easily disposable evidence was present and would be so disposed of if a demand for admittance and explanation of purpose were made. Despite petitioner's careful argument to the contrary, this court is persuaded that respondent is correct.

In People v. Gastelo, 67 Cal.2d 586, 63 Cal.Rptr. 10, 432 P.2d 706 (1967), the California Supreme Court stated that California lower court cases prior to that time had included the prevention of destruction of evidence as one ground for noncompliance with Cal.P.C. § 844, in addition to the grounds of physical peril to the officers or frustration of the arrest. 63 Cal.Rptr. at 11–12, 432 P.2d 707–708. However, in response to the contention of the State Attorney General, the *Gastelo* court went on to say that it, the State Supreme Court, had never sanctioned a blanket rule which would automatically permit noncompliance in a given type of case, e. g., narcotics. 63 Cal. Rptr. at 12, 432 P.2d at 708.

*Gastelo* therefore made it quite clear that *from then* on, noncompliance simply on the basis of the kind of evidence involved would not be permitted. What *Gastelo* left uncertain, however, was whether its pronouncement changed the law or merely stated existing law. Authoritative light was finally shed on this matter in People v. De Santiago, 71 Cal. 2d 18, 76 Cal.Rptr. 809, 453 P.2d 353 (1969). There, the State Supreme Court, in a full discussion, pointed to the large number of State Courts of Appeal narcotics cases in which noncompliance with § 844 was permissible simply on the basis that the arresting officers believed in good faith that compliance would

---

3. Along the same line, petitioner argues that the arrest was merely an incident of the search. But as stated above, the police had probable cause to arrest Charlie wholly apart from anything found in their search of his house. Moreover, the fact that the search may have momentarily preceded the arrest—if that be the case herein—does not vitiate the search as long as in the circumstances, the two are reasonably contemporaneous. See United States v. Maynard, 439 F.2d 1086, Ninth Cir., 1971.

cause destruction of the evidence. The court therefore concluded that:

> From the foregoing summary it is manifest that, prior to the *Gastelo* case, competent and knowledgeable defense counsel concerned with preventing the admission of evidence obtained by means of an entry which failed to comply with the provisions of section 844 or section 1531 [similar notice requirements relating to execution of search warrant] could only have concluded that compliance with these sections was excused by law without any showing of particular exigency whenever the nature of the evidence sought was such as to facilitate easy disposal. In *Gastelo*, however, *we held precisely to the contrary.* [emphasis added]

This is a clear statement that under pre-*Gastelo* law,[4] an arrest such as the one herein was valid, since the highest state courts which had considered the matter had so held. While the *De Santiago* court spoke in terms of what a competent and knowledgeable attorney would have concluded, rather than in terms of what the law actually "was", there is no appreciable difference between the two inquiries. The lengthy citation of intermediate appellate court decisions prior to *Gastelo* which excused compliance with § 844 simply because of good faith fear of destruction of narcotics amply demonstrates that the state courts, in declaring what the law "was", were not differing from what competent attorneys were also concluding.

■ Petitioner asserts that even if the method of arresting Charlie Pineda was proper under state law, yet it none-theless contravened the Fourth Amendment. This court notes that no United States Supreme Court has ever held that the essence of Cal.P.C. § 844, or its federal counterpart, 18 U.S.C. § 3109, is *per se* an ingredient of the Fourth Amendment's protection. The four dissenters in Ker v. California (two of whom are no longer on the Court) were certainly amenable to such a view, but four other Justices, with the concurrence of Justice Harlan, upheld the constitutionality of the California judicial rule of noncompliance with § 844, at least where, in addition to easily disposable evidence, the suspect believed that he was being pursued by the police. While *Ker* did not therefore pass upon the more relaxed rule of noncompliance which the California intermediate appellate courts had developed, the view of this court is that at least at the time of the arrest of Charlie Pineda, noncompliance with § 844 solely because of a reasonable fear of destruction of the evidence was constitutional. While this conclusion indicates that *Ker* would have been decided in the way that it was even without the additional factor of the suspect believing he was being pursued, this court is unable to draw a different conclusion. The California Courts of Appeal which sanctioned such arrests were of course cognizant of *Ker* and under a duty equal to that of this court to follow *Ker*; yet, those courts found no constitutional infirmity in arrests such as this one.[5]

## D. NECESSITY VEL NON OF AN ARREST WARRANT

Petitioner's final argument regarding the search of the house is that the night-

---

4. The *De Santiago* decision accorded to *Gastelo* a limited retroactive effect in that it permitted the raising of the *Gastelo* question for the first time on appeal. This was because *Gastelo* was an unforeseeable change in the law; thus the failure to raise the issue at trial was excusable. Therefore, any case on appeal at the time *Gastelo* was decided could raise the issue. This limited retroactivity cannot benefit petitioner herein, however, since his conviction became final, except insofar as sentencing was concerned, in 1965. See People v. Pineda, 253 Cal.App.2d 443, 62 Cal.Rptr. 144.

5. See Alonzo v. United States, 439 F.2d 991, Ninth Cir., 1971, wherein the Court of Appeals for this circuit upheld the denial of motion to suppress evidence which had been seized in violation of Cal. P.C. § 844. There were circumstances in addition to the destructibility of the evidence.

time entry of the house to make an arrest of Charlie Pineda required a valid arrest warrant. Petitioner contends that the Fourth Amendment requires that an arrest warrant be procured before officers can lawfully make an unannounced nighttime entry into a dwelling to arrest a person (except in those few circumstancs where time obviously does not permit the prior procurement of a warrant, e. g., "hot pursuit".) As authority for this proposition, petitioner cites the dictum of the Supreme Court in Jones v. United States, 357 U.S. 493, 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1968) (to the effect that grave constitutional questions are presented by a warrantless nighttime entry) and the strong dictum in Dorman v. United States, 435 F.2d 385, D.C.Cir., 1970 (to the effect that the arrest warrant is required by the Fourth Amendment except in certain exigent circumstances).

This court will not express an opinion on the *Dorman* case, since even were we to agree with that decision, it would not benefit petitioner. Respondent has aptly pointed out that the new Fourth Amendment doctrines enunciated by the Supreme Court have been accorded prospective application only. E. g., Desist v. United States, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); Hill v. California, 401 U.S. 797, 91 S.Ct. 1106, 28 L. Ed.2d 484 (1971). Even were this court inclined to follow *Dorman,* therefore, we would accord the holding only prospective effect and thus deprive petitioner of its possible benefits.[6] See, e. g., Williams v. United States, 418 F.2d 159, 162 (Ninth Cir. 1969).

■ The court thus concludes that the arrest of Charlie Pineda was a valid warrantless arrest, and that the search of his residence (the scope of the search is not in issue) was also valid as incident to the arrest. The contraband and other items seized were therefore properly

used in the conviction of Ernest Pineda, petitioner.

## III. THE ASSISTANCE OF COUNSEL ISSUE

The remaining contention of petitioner is that he was deprived of his Sixth Amendment right to the effective assistance of counsel because of an agreement between his trial counsel and counsel for his brother, Charlie. The substance of this agreement, and the facts surrounding it, are as follows:

About a month before the trial of petitioner, petitioner's lawyer had a conversation at his office with Charlie Pineda. They discussed evidence which Charlie might give in connection with his brother Ernie's trial. (RT 7). Charlie told petitioner's counsel that the heroin which was seized was his, and that he would be willing to so testify in order to exonerate his brother. (RT 7). A day or so before the trial, however, petitioner's counsel received a telephone call from a Mr. Krickberg, who was representing Charlie in Charlie's criminal case. Mr. Krickberg advised petitioner's counsel that he had instructed Charlie not to incriminate himself at Ernie's proceedings. In light of this, petitioner's counsel proposed an agreement whereby he would only ask of Charlie whether of his own knowledge the heroin belonged to his brother Ernie. Charlie would answer appropriately, but would then be instructed to invoke his Fifth Amendment privilege against self-incrimination in response to any further questions by the district attorney. (RT 8). This agreement was actually carried out at the trial.

Petitioner's attorney made this arrangement without consulting petitioner. (RT 41). Petitioner expected all along that his brother Charlie would testify and exonerate him. It was not until late 1969 that petitioner learned of this agreement. (RT 42).

---

6. Respondent also makes an argument—on which the court need not pass—that in any event, *Dorman* would not aid petitioner since in the instant case, entry was made pursuant to a search warrant, which, although later declared invalid, did give the police the sanction of a magistrate to enter the house at nighttime.

Petitioner's present argument is that he was denied his Sixth Amendment right not because of his attorney's failure to attempt to compel Charlie Pineda to incriminate himself on the witness stand, but because of his failure to present independent evidence showing that Charlie and not Ernie was the true possessor of the heroin in question. The independent evidence to which he refers consists of two things: (1) Charlie Pineda's declaration against penal interest when he told petitioner's attorney that the heroin was his and not Ernie's; and (2) medical records of the withdrawal symptoms suffered by Charlie in the county jail following his arrest.

In this Circuit, the case of Brubaker v. Dickson, 310 F.2d 30 (1962) established the applicable standards by which the performance of the counsel is to be measured. The court stated:

> This does not mean that trial counsel's every mistake in judgment, error in trial strategy, or misconception of law would deprive an accused of a constitutional right. Due process does not require "errorless counsel, and not counsel judged ineffective by hindsight, but counsel reasonably likely to render *and rendering* reasonably effective assistance." Determining whether the demands of due process were met in such a case as this requires a decision as to whether "upon the whole course of the proceedings," and in all the attending circumstances, there was a denial of fundamental fairness; it is inevitably a question of judgment and degree. [citation omitted]

310 F.2d at 37.

A common shorthand expression of these concepts is that the assistance of counsel is constitutionally ineffective if trial counsel is "so incompetent or inefficient as to make the trial a farce or a mockery of justice." Stevens v. Nelson, 302 F.Supp. 968, 969 (N.D.Cal.1968), affirmed 417 F.2d 1337 (Ninth Cir. 1969), quoting from Peek v. United States, 321 F.2d 934, 944 (Ninth Cir. 1963).

A careful consideration of the transcript of petitioner's trial and of the testimony given at the evidentiary hearing in this court persuades the court that petitioner was not denied his Sixth Amendment right to the effective assistance of counsel. Essentially, petitioner's counsel either made a strategic choice in the interests of his client, or else was ignorant of the availability of the independent evidence now referred to by petitioner. In either case, the right to the effective assistance of counsel was not infringed.

In the case of People v. Spriggs, 60 Cal.2d 868, 36 Cal.Rptr. 841, 389 P.2d 377 (1964) the California Supreme Court established the rule in California that declarations against penal interest would, from that time forward, be admissible as exceptions to the hearsay rule. This decision was handed down some seven months prior to petitioner's trial. Petitioner argues that if his trial counsel had not made the "gentleman's agreement" with Charlie Pineda's counsel, then he could have utilized the *Spriggs* decision by retaining other counsel to conduct petitioner's trial, and then by appearing as a witness to testify that Charlie Pineda had told him that the heroin was in fact his and not his brother's. But in this court's view, if trial counsel was aware of the *Spriggs* decision, and had thought of testifying himself, still his failure to do so was part of his strategy in aid of his client—viz. that his client would best be served by procuring the testimony of Charlie Pineda (that he knew of his own knowledge that the heroin was not petitioner's) in exchange for agreeing not to incriminate Charlie. That is, if trial counsel deliberately decided not to go the route which *Spriggs* offered, this decision reflected counsel's view that the chances of an acquittal for his client would be increased by obtaining in exchange the testimony of Charlie Pineda. This was certainly a permissible strategic choice, well within the bounds of competence of the average criminal defense attorney. Indeed, the bargained-for testimony of

Charlie Pineda was rather strong; in itself, it certainly tended to incriminate Charlie, amounting nearly to a confession of guilt.

■ Even if trial counsel was in fact ignorant of the seven-month-old *Spriggs* case,[7] nonetheless such ignorance would not amount to a deprivation of the right to effective assistance of counsel. In the court's view, the ignorance of the creation of a new exception to the hearsay rule, pronounced seven months earlier, did not, at least in the context of this case, render the assistance of counsel constitutionally ineffective. First, this lack of knowledge, while not commendable, would not be constitutionally proscribed unless the failure to discover the rule of law prevented the presentation of a crucial defense or otherwise fundamentally impaired the fairness of the trial. See People v. Ibarra, 60 Cal.2d 460, 34 Cal.Rptr. 863, 386 P.2d 487 (1963). Second, trial counsel's ignorance of the *Spriggs* case did not deprive petitioner of a crucial defense, however, since that defense—that the heroin was not petitioner's—was in fact presented by way of Charlie Pineda's testimony. In this situation, the court is plainly unable to conclude that the fundamental fairness of the trial was impaired, or that the trial became a farce or mockery of justice.[8]

Petitioner alludes to one other piece of independent evidence which circumstantially shows Charlie and not petitioner to be the true possessor of the heroin, viz. the jail medical records indicating Charlie's withdrawal symptoms on the night of the arrest. Once again, petitioner did not establish at the hearing before this court whether petitioner's trial counsel was simply ignorant of the existence of these records, or knew of them but refrained from using them at trial pursuant to the "gentleman's agreement", i. e., in exchange for Charlie's testimony. In either event, however, as discussed above in relation to the *Spriggs* decision, there was no denial of the right to the effective assistance of counsel.

Petitioner also relies heavily on Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), for the theory that his trial counsel labored under a conflict of interests which precluded him from rendering constitutionally effective assistance. In *Glasser,* Glasser and an alleged co-conspirator co-defendant were represented at trial by the same attorney pursuant to the order of the trial court. The interests of these two defendants obviously conflicted, and the attorney failed to object to statements which were harmful to Glasser but beneficial to his co-defendant. The Supreme Court held that counsel's struggle to serve two masters deprived Glasser of the effective aid of counsel.

■ The present case does not fit within the *Glasser* rubric. It is true that as a result of his agreement with Char-

---

7. At the evidentiary hearing, petitioner did not establish whether trial counsel was aware of *Spriggs* but refrained from using it in exchange for the testimony of Charlie, or was simply ignorant of the decision. Accordingly, both possibilities are herein discussed.

8. Moreover, the court notes that even if the supposed ignorance of *Spriggs* had deprived petitioner of a defense, still it is not clear that this in itself would render the conviction infirm on Sixth Amendment grounds. Perfection of performance is not the standard to be used, else few performances of even the most

able attorneys could withstand constitutional scrutiny. And in the instant case, there is some indication that the *Spriggs* decision was little enough known so that even petitioner's present counsel, so skilled in the criminal law as he is, did not readily think of that case or readily perceive its application to petitioner's trial. (See *respondent's posthearing reply memorandum,* pages 12–13). In any event, however, the court relies on its above conclusion—that petitioner was not deprived of a vital defense—in rejecting petitioner's contention.

lie's counsel, petitioner's trial counsel bound himself to protect Charlie's Fifth Amendment rights at petitioner's trial. But this is hardly a conflict of interests which disenables an attorney to provide undivided attention to his client's cause. In fact, the very purpose of the agreement with Charlie Pineda's attorney was to secure at least some testimony favorable to petitioner. Had not the agreement been reached, it appears more than likely that Charlie Pineda would have "taken the Fifth" even in response to the query: To the best of your knowledge, was the heroin Ernie's heroin?[9] The answer to this question certainly tended to incriminate Charlie Pineda; accordingly, his right to remain silent attached. Yet, trial counsel secured an answer to this question, an answer very favorable to petitioner. The fact that in order to do so, counsel had to protect Charlie's Fifth Amendment rights during cross-examination does not cast this case into the *Glasser* mold.

In the final analysis, trial counsel made a rational choice in the interests of his client. This choice, embodied in the agreement between counsel, was essentially no different from any number of similar compromises which a lawyer may be forced to make to further his client's cause. Just because counsel here assumed a burden in exchange for a benefit does not mean he was not fully and solely serving petitioner.

 Petitioner claims that his trial counsel violated Canon Six of the Canons of Professional Ethics. As it then read, this Canon provided:

It is unprofessional to represent conflicting interests, except by express consent of all concerned given after a full disclosure of the facts. Within the meaning of this canon, a lawyer represents conflicting interests when, in behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose.

Initially, the court notes that of course petitioner's trial counsel had no lawyer-client relationship with Charlie Pineda. On its own terms, then, the Canon is inapposite. More fundamentally however, the spirit of the Canon was equally not violated, except for the fact that counsel did not inform petitioner of the agreement that had been reached. This latter fact is hardly commendable, but it does not erase the basic consideration that petitioner's interests were the only interests sought to be furthered by trial counsel.[10]

The court therefore concludes that while the performance of petitioner's trial counsel certainly did not establish any standards of excellence, yet it was a considerable way off from being constitutionally ineffective. No Sixth Amendment right to counsel was denied petitioner.

Accordingly, for the reasons hereinbefore stated, it is ordered that the petition is denied, the order to show cause is discharged, and the case is dismissed.

So ordered.

---

9. See page 74 of the trial transcript for the actual inquiry, and for the response that Ernie did not have the heroin in his possession that night.

10. The court does not pass on the question of what bearing a violation of one of the Canons should have on a Sixth Amendment inquiry, since the court finds no violation here. In Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948), the Supreme Court cited two other Canons in support of its conclusion that the Sixth Amendment's right to assistance of counsel had been violated. It is likely, however, that not much weight was ascribed to the Canons in that case, since the constitutional denial was clear.